SCHIEFFELIN & CO., Plaintiff,

v.

The JACK COMPANY OF BOCA, INC. and John P. Calderaio, individually and doing business as The Jack Company, Inc., Defendants.

No. 89 Civ. 2941 (PKL).

United States District Court,
S.D. New York.

Dec. 4, 1989.

Robin, Blecker, Daley & Driscoll, New York City, Marie V. Driscoll, Jon A. Lewis, C. Donald Mohr, of counsel, for plaintiff.

Scully, Scott, Murphy & Presser, Garden City, N.Y., Kenneth L. King, John S. Sensny, of counsel, for defendants.

## ORDER & OPINION

LEISURE, District Judge:

Plaintiff Schieffelin & Co. ("Schieffelin") brings this action for injunctive and monetary relief against defendants The Jack Company of Boca, Inc. ("The Jack Company") and its president John P. Calderaio. Schieffelin distributes the champagne Dom Perignon and owns a registered trademark of the champagne's label. Schieffelin alleges that The Jack Company has violated the Federal Trademark Act (the "Lanham Act"), the General Business Law of the State of New York, and New York common law by marketing a popcorn product whose packaging bears a physical resemblance to Schieffelin's champagne label. Schieffelin asks that this Court enter a permanent injunction against the sale or distribution of defendants' popcorn product, order that all labels, advertising, and packaging which infringe on the Dom Perignon trademark be destroyed, and find defendants liable to Schieffelin for all profits realized on the popcorn.

Defendants have filed a motion to dismiss the action against John P. Calderaio for lack of personal jurisdiction, to dismiss the case against all defendants for improper venue or transfer the case to the proper district, and to dismiss certain counts of the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Plaintiff opposes the motion in all respects.

## BACKGROUND

Plaintiff owns all rights to trademarks in the name Cuvee Dom Perignon and in a shield design used as a label on Dom Perignon bottles. These trademarks have been registered with the United States Patent and Trademark Office for over twenty years, and Schieffelin claims that they have become "famous" and "symbolize a very valuable business and goodwill belonging exclusively to plaintiff." Complaint, ¶ 9. The trademarked shield is gold with a black leaf design around the perimeter and scripted black writing. The words "Cuvee Dom Perignon" appear in the middle of the shield directly over a horizontally-striped star. Other inscriptions on the label give the year of the vintage, the percentage of alcohol contained by volume, and the words "fondee en 1745," which note the founding year of the winery.

Defendant The Jack Company is a Florida corporation based in Boca Raton, Florida, which markets a variety of products such as T-shirts, jelly beans, and unpopped popcorn. The Jack Company markets its products in several states, and consumption of the products is widely dispersed. The popcorn product is called Champop and is packaged in a champagne bottle of similar proportions to Dom Perignon. More significantly, the label affixed to Champop bottles is of identical shape and color as the Dom Perignon label though it is slightly larger. The popcorn label states the name "Dom Popignon" in a black script over a horizontally-striped star. The popcorn label also gives a vintage year, a percentage of alcohol contained by volume (zero), and the words "fondee en 1986," which apparently refer to a significant date in the history of the Champop product.

Neither of the defendants have ever maintained any offices or bank accounts in New York State. Nor have they owned any real estate or other property in New York. Deposition of John P. Calderaio, sworn to on July 27, 1989, at 19 ("Calderaio Deposition"). The Jack Company is not licensed to do business in New York. Calderaio Deposition at 8. But on four occasions in 1988 and 1989, John Calderaio, acting solely in his capacity as president of The Jack Company, travelled to New York City to attend trade shows at the Javits Convention Center in Manhattan. Calderaio Deposition at 20; Declaration of John P. Calderaio, sworn to on June 19, 1989, ¶¶ 5–6 ("Calderaio Declaration").

Calderaio's purposes in attending the trade shows in New York were to show his products, among them Dom Popignon, and to conduct business transactions. Calderaio Deposition at 21. While in New York, he executed the sale of approximately 10,000 bottles of Dom Popignon. Calderaio Deposition at 25. The total number of bottles of Champop sold so far is near to 16,000. Calderaio Deposition at 61, 65. Approximately 2256 or 14.1% of the 16,000 bottles have been sold to customers residing or locating their businesses in New York State. Of these bottles, 768 or 4.8% were sold to customers in the Southern District of New York. Affidavit of Jon Lewis, sworn to on August 22, 1989, ¶¶ 4–5 ("Lewis Affidavit").[1] Defendants also distributed 62 Dom Popignon display kits, each containing three bottles of Champpop, to customers in New York State, 22 of them in the Southern District. Calderaio Deposition at 56. The total value of all sales of Dom Popignon to New York customers is $12,300, $4,300 of which is attributable to sales in the Southern District. Lewis Affidavit, ¶ 6.

On March 13 and 14, 1989, Schieffelin hired a private market research company to conduct a pilot study on whether Dom Popignon was likely to cause consumer confusion with Dom Perignon. Fifty interviews were conducted with shoppers in Manhattan stores which sold Dom Popignon. The president of the market research company, in a sworn affidavit now before the Court, interpreted the results of the study as showing that it was "likely that a significant level of customer confusion" was occurring. Affidavit of Ronald C. Silver, sworn to on August 18, 1989, ¶ 7 ("Silver Affidavit"). More specifically, 46% of those asked thought that the producers of Dom Popignon had obtained permission to sell Champpop, and 28% immediately thought of Dom Perignon when first showed the Dom Popignon bottle. Silver Affidavit, ¶ 7. The president of the market research company further stated that he had a "reasonable degree of confidence that if the survey were expanded to include

more respondents, significant levels of confusion would still be shown." Silver Affidavit, ¶ 8.

On April 28, 1989, Schieffelin & Co. filed this lawsuit in federal court. The first count of the complaint alleges infringement upon plaintiff's registered trademark in violation of the Federal Trademark Act (the "Lanham Act"), 15 U.S.C. § 1114. The second count claims that defendants made false representations as to the source and origins of the Dom Popignon product in violation of the Lanham Act, 15 U.S.C. § 1125(a). The third count accuses defendants of unfair competition under the common law of New York. The fourth count alleges unlawful dilution of the distinctive quality of plaintiff's trademark and injury to plaintiff's business reputation under the General Business Law of the State of New York, § 368–d. In response to the complaint, defendants moved this Court to dismiss defendant Calderaio for lack of personal jurisdiction, to dismiss the entire case for improper venue or transfer it to the Southern District of Florida, and to dismiss the first three counts of the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6).

## DISCUSSION

### A. Personal Jurisdiction

Defendant Calderaio claims that this Court does not have personal jurisdiction over him in his individual capacity. All of his individual actions relating to the alleged trademark infringement, he argues, took place in Florida. Defendants' brief at 3. The business trips that Calderaio took to New York were all in his capacity as president of The Jack Company, and he has never transacted business in New York for himself. Calderaio Declaration, ¶¶ 5–7.

■ The "fiduciary shield" doctrine prevents a court from exercising jurisdiction over an individual corporate officer if the officer acted solely within his corporate capacity in the forum state. *CutCo Indus-*

---

1. Plaintiff's attorney obtained these figures by analyzing sales documents released by defen-

dants in response to Plaintiff's First Request for Documents and Things, June 23, 1989.

**1318**

*tries, Inc. v. Naughton*, 806 F.2d 361, 367 (2d Cir.1986); *Marine Midland Bank v. Miller*, 664 F.2d 899 (2d Cir.1981). The fiduciary shield doctrine has been employed by courts when it would be inequitable to exercise jurisdiction directly over the corporate officer. The inquiry most often pursued is whether the corporate entity is a mere shell created for the benefit of the individual, or whether the officer conducted business essentially for the benefit of and in response to the corporation. *Marine Midland, supra*, 664 F.2d at 903.

Both the Second Circuit and the New York Court of Appeals have recently held that the fiduciary shield doctrine is inapplicable when jurisdiction is asserted under the New York long-arm statute. *Retail Software Services, Inc. v. Lashlee*, 854 F.2d 18, 22–24 (2d Cir.1988); *Kreutter v. McFadden Oil, Inc.*, 71 N.Y.2d 460, 471–72, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988). The state Court of Appeals found sufficient protection for individual corporate officers in the constitutional and statutory jurisprudence of long-arm jurisdiction already in existence, and held that applying the fiduciary shield doctrine would be unfair to plaintiffs. *Kreutter, supra*, 71 N.Y.2d at 471, 527 N.Y.S.2d 195, 522 N.E.2d 40. The state court did not focus on the nature of the corporation-officer relationship, as did the Second Circuit in *Marine Midland*.

 This Court follows the most recent holdings of the Second Circuit and the New York Court of Appeals and finds the fiduciary shield doctrine inapplicable to long-arm jurisdiction. Even if this Court found the fiduciary shield doctrine relevant, this case would not be a likely instance for the doctrine's invocation. Calderaio is president of a corporation with two shareholders (Calderaio and his brother) and three officers (Calderaio, his wife, and his brother). When Calderaio travelled to New York to transact business for The Jack Company, he was working essentially for his own

---

benefit within a corporate shell. Given these facts, it would not be inequitable to rule that this Court has jurisdiction over Calderaio in his individual capacity.[2]

 Under the New York long-arm statute, C.P.L.R. § 302(a)(2), a court located in New York can exercise jurisdiction over any nondomiciliary who either in person or through an agent commits a tort in New York. In trademark actions, the tort is said to occur where the defendant sells or attempts to sell the offending product. *Artemide SpA v. Grandlite Design And Mfg. Co., Ltd.*, 672 F.Supp. 698, 705 (S.D.N.Y. 1987); *Business Trends Analysts v. Freedonia Group, Inc.*, 650 F.Supp. 1452, 1455–56 (S.D.N.Y.1987); *Oral–B Laboratories, Inc. v. Mi–Lor Corp.*, 611 F.Supp. 460, 461–62 (S.D.N.Y.1987).

 Plaintiff has established that defendant Calderaio, acting on behalf of The Jack Company, made four trips to a location within the Southern District of New York to sell Dom Popignon. While in the Southern District, Calderaio sold his corporation's product to a variety of retailers from both the Southern District and outside. These facts are a sufficient basis on which the Court may exercise personal jurisdiction over both Calderaio and The Jack Company. It is unimportant that the manufacture, assembly, and distribution of Dom Popignon took place outside the Southern District.

### B. Venue

Plaintiff has brought this action in the Southern District of New York under the authority of the federal venue statute. Because federal questions are involved in this case, the relevant provision is found at 28 U.S.C. 1391(b) and reads as follows:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in

---

**2.** Because all persons and corporations who participate in, exercise control over, or benefit from a trademark infringement are jointly and severally liable, it is axiomatic that they may not shield themselves from liability through a shell corporation. *See, e.g., Sygman Photo*

*News, Inc. v. High Soc. Magazine*, 778 F.2d 89, 92 (2d Cir.1985) (trademark infringement case); *but see William Wrigley Jr. Company v. Waters*, 890 F.2d 594, 600–601 (2d Cir.1989) (diversity case applying New York law).

which the claim arose, except as otherwise provided by law.

Plaintiff Schieffelin & Co. argues that this case is properly located in this Court, because the claim arose in New York City when defendants sold their product to retailers at the Javits Convention Center.

■ The language "or in which the claim arose" was added to the statute in 1966. The purpose of this amendment was to close the so-called "venue gap," which was compelling multi-district litigation when several defendants were joined in one lawsuit. *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.*, 406 U.S. 706, 710 n. 8 (1972). Congress did not intend to permit a plaintiff to bring suit in each district where some small part of the claim arose. Thus in trademark infringement cases, the amended statute was not meant to allow the plaintiff to sue in every district where the offending product is sold. *Sunray Enterprises v. David C. Bouza & Associates*, 606 F.Supp. 116, 118–19 (S.D.N.Y. 1984); *Seabrook Foods, Inc. v. Seabrook Bros. & Sons, Inc.*, 495 F.Supp. 792, 794 (S.D.N.Y.1980); *Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 892 (S.D.N.Y.1974).

■ The text of the statute does not assist courts in determining whether a claim arose in a particular jurisdiction for venue purposes. In trademark cases, courts have been on their own in deciding whether the manufacture, distribution, or sale, and how much of each, is dispositive in locating venue. This Court has borrowed the "weight of contacts" test from antitrust and securities cases in locating venue in trademark infringement actions. *Honda Associates, supra*, 374 F.Supp. at 891–92. Under this test, a lawsuit for trademark infringement may be brought wherever the defendant's contacts are most significant, and these contacts must be more than minuscule. *Id.*

Since the Supreme Court decision in *Leroy v. Great Western Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the "weight of contacts" test has not been uniformly applied by this Court. In brief, *Leroy* held that when the claim can be said to arise in more than one jurisdiction, a different analysis is used. In such cases, courts should locate venue according to the accessibility of evidence and witnesses and the convenience of the defendant. *Id.* at 185, 99 S.Ct. at 2717.

As will be discussed below, the Southern District of New York is split as to whether *Leroy* applies in all trademark infringement cases, or whether the "weight of contacts" test can still be used in certain situations. The case at bar is somewhat unique: while the claim can be said to arise in each district where Champop is sold thus suggesting the applicability of *Leroy*, the large majority of sales took place in New York City which lends propriety to the "weight of contacts" test. The Court will not choose to follow either approach in its entirety. Rather, it will adopt the concerns of both as they relate to the particular situation in this case.

■ Defendants argue that since all the packaging and distribution of Dom Popignon took place in Florida, and since all of defendants' witnesses and corporate records are in Florida, the lawsuit can only be properly located there. Yet in determining where "the claim arose" under the venue statute, courts must first look to where the operative facts giving rise to the legal claim occurred. *Kupcho v. Steele*, 651 F.Supp. 797, 801 (S.D.N.Y.1986); *Glickman v. United States*, 626 F.Supp. 171, 177 (S.D.N.Y.1985); *Jaffe v. Boyles*, 616 F.Supp. 1371, 1377 (W.D.N.Y.1985). Deciding which facts are operative requires reference to the substantive law underlying the plaintiff's legal claims. *Jaffe, supra*, 616 F.Supp. at 1377.

Claims for trademark infringement or unfair competition are said to arise "not where the deceptive labels are affixed to the goods or where the goods are wrapped in the misleading packages, but where the passing off occurs, i.e., where the deceived customer buys the defendant's product in the belief that he is buying the plaintiff's." *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); *Tefal, S.A. v. Products International Co.*,

529 F.2d 495, 496 n. 1 (3d Cir.1976); *Premier Herbs, Inc. v. Nature's Way Products, Inc.,* 689 F.Supp. 180, 184 (S.D.N.Y.1988); *Manufacturers Hanover Corp. v. Maine Savings Bank,* No. 84 Civ. 2046, 1985 WL 181 (S.D.N.Y. Jan. 10, 1985).

When a defendant in a trademark infringement suit assembles his product and ships it out from one state, but actively markets it through a second state, then venue is properly located in the second state. Any other holding would allow mail-order companies to litigate only in their home state and would emasculate the "where the claim arose" language of 28 U.S.C. 1391(b). *Business Trends Analysts, supra,* 650 F.Supp. at 1457; *see also Polo Fashions, Inc. v. Get Off Your High Horse, Inc.,* No. 83 Civ. 7437, 1984 WL 957 (S.D.N.Y. Oct. 4, 1984).

To determine whether a sufficient amount of the claim arose in a state for venue purposes, courts will look to the percentage of national sales of the offending product executed in that state. In some cases, relatively small percentages of sales have been held to be sufficient to locate the lawsuit in the state. *Tefal, supra,* 529 F.2d at 496 (5% of national sales and an in-state sales agent sufficient); *Business Trends Analysts, supra,* 650 F.Supp. at 1457 (9% of defendant's mailing list consisting of New York residents and an in-state sales agent sufficient); *Children's Television Workshop v. Maxim,* 223 U.S.P.Q. 965, 968, 1984 WL 1349 (8% of national sales in New York, of which 11% were in the Southern District, held to be sufficient); *Polo Fashions, supra,* No. 83 Civ. 7437 (0.52% of national sales in New York sufficient); *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279, 287 (S.D.N.Y.1977) (1% of national sales and an in-state sales agent sufficient).

In other cases, this Court has found percentages of national sales in the same range insufficient. *Off-the-Wall Products v. Hyman Products, Inc.,* 684 F.Supp. 36, 39–40 (S.D.N.Y.1988) (5% of national sales in dollars insufficient); *Better Sleep, Inc. v. LaLoren, Inc.,* No. 84 Civ. 8133, 1985 WL 362 (S.D.N.Y. March 1, 1985) (3% of

national sales insufficient); *Georgia Boot Division of U.S. Industries, Inc. v. Georgia Footwear Corp.,* 579 F.Supp. 1037, 1038 (S.D.N.Y.1984) (13% of national sales by one defendant insufficient where other defendants had minuscule sales in the state, and plaintiff was not located in the state); *Seabrook, supra,* 495 F.Supp. at 794 (less than one-sixth of national sales insufficient).

The Jack Company sold approximately 10,000 bottles of Champop out of a total 16,000 bottles sold nationwide at the trade shows in Manhattan. Thus approximately 63% of national sales took place in the Southern District of New York. Over 14% of the buyers of Champop had businesses located in New York, 4.8% in the Southern District. Though The Jack Company has no other contacts with New York—no office, no property, and no sales agent—the fact that it took advantage of New York to sell its product, and sold it to many New York businesses, is sufficient to locate venue in this Court under the "weight of contacts" test.

In 1979, the Supreme Court confronted the problem of where to locate a lawsuit when the claim conceivably arises in more than one district. In *Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the Court stated:

> In our view, therefore, the broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)—may be assigned as the locus of the claim.

*Id.* at 185, 99 S.Ct. at 2717. Thus the Supreme Court cut back on the potential reach of § 1391(b) in order to protect the defendant against the possible unfair ramifications of the statute's language.

The Southern District of New York has not applied *Leroy* consistently in trademark infringement cases. In some instances, the Court has held that the *Leroy* formula must be applied in all cases where the offending product is sold in more than one state. *Manufacturers Hanover Corp., supra,* No. 84 Civ. 2046. This approach would replace the "weight of contacts" test and hold that the factors laid out in *Leroy* are controlling. *German Educational Television Network v. Oregon Public Broadcasting Co.,* 569 F.Supp. 1529, 1533–34 (S.D.N.Y.1983).

At other times, this Court has held that *Leroy* only applies when it is not clear that the claim arose in one specific district. *Premier Herbs, supra,* 689 F.Supp. at 185; *see Penta Hotels Ltd. v. Penta Tours Reisen GmBh,* No. 85 Civ. 4181, 1986 WL 1797 (S.D.N.Y. February 6, 1986). In *Premier Herbs,* the Court decided not to apply *Leroy,* because it had no evidence before it indicating that sales of the offending product took place anywhere outside of New York. The Court thus located venue where a substantial portions of the sales took place. *Premier Herbs, supra,* 689 F.Supp. at 185–86.

■ In the case at bar, there is evidence before the Court that sales of Champop were nationwide. However, the percentage of sales in New York is not only a majority of total sales but also seems to largely outnumber sales in any other individual state. At the same time, the concerns of *Leroy* do not compel the Court to find improper venue under § 1391(b). While it would be more convenient for defendants to litigate in Florida, there is no evidence before the Court that it would be more efficient to litigate the case in Florida in terms of the location of witnesses and evidence. In sum, it is not unfair to defendants to make them litigate in New York, after they have availed themselves of New York markets for more than half the sales of their product. It would be unfair to plaintiff to make it litigate in Florida just because defendants affix labels to and package their product in that state.

## C. Transfer

■ In the alternative to finding improper venue under 28 U.S.C. § 1391, defendants ask that this Court exercise its discretionary power to transfer the action to the Southern District of Florida under 28 U.S.C. § 1404(a). The transfer statute reads as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

This Court weighs the following factors in considering whether to transfer a case under § 1404(a): 1) convenience of the parties and witnesses; 2) access to proof; 3) other practical problems making trial of a case expeditious and inexpensive; 4) availability of process to compel attendance of unwilling witnesses; and 5) the interest of justice. *Seagoing Uniform Corp. v. Texaco, Inc.,* 705 F.Supp. 918, 935 (S.D.N.Y.1989); *Y4 Design, Ltd. v. Regensteiner Publishing Enterprises,* 428 F.Supp. 1067, 1068–69 (S.D.N.Y.1977).

■ The burden of demonstrating the desirability of transfer lies with the moving party. *Factors Etc., Inc. v. Pros Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Seagoing Uniform, supra,* 705 F.Supp. at 936. The moving party must make a clear-cut showing that transfer is in the best interests of the litigation. *Feigenbaum v. Marble of America, Inc.,* No. 89 Civ. 0271, 1989 WL 66646 (S.D.N.Y. June 9, 1989); *Soltron, Inc. v. McAngus,* No. 86 Civ. 486, 1987 WL 12832 (S.D.N.Y. June 12, 1987). More specifically, the moving party must name the witnesses who will be appearing and describe their testimony so that the court may measure the inconvenience caused by locating a lawsuit in a particular forum. *Factors Etc., supra,* 579 F.2d at 218; *Feigenbaum, supra,* No. 89 Civ. 271; *Dubied Machinery Co. v. Vermont Knitting Co., Inc.,* No. 85 Civ. 8610, 1989 WL 16607 (S.D.N.Y. Feb. 21, 1989).

■ In general, unless the balance of factors weighs strongly in favor of the

defendant, the plaintiff's choice of forum should remain undisturbed. *Seagoing Uniform, supra,* 705 F.Supp. at 936 (*citing Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)); *Dubied Machinery, supra,* No. 85 Civ. 8610. The court should not order a transfer which would merely switch the burden of inconvenience from one party to the other. *Seagoing Uniform, supra,* 705 F.Supp. at 936.

Defendants argue that since the bulk of the evidence and the witnesses concerning the activities of The Jack Company and its president John Calderaio are in Florida, the lawsuit would be most efficiently conducted there rather than in New York. Defendants have not listed the prospective witnesses or described their testimony as is required by case law. Based on the information now before the Court, there is nothing to show that a transfer would not simply switch the inconvenience from defendants to plaintiff. Thus defendants have not met their burden of proof in justifying a transfer of this case. The lawsuit will remain before this Court.[3]

### D. Motion to Dismiss

Defendants have moved under Fed.R. Civ.P. 12(b)(6) to dismiss the first three counts of the complaint for failure to state a claim upon which relief can be granted. Defendants argue that plaintiff's claims under the Lanham Act and New York common law should be dismissed, because there is little chance that a ten-dollar bottle of popcorn will be confused with a much more expensive bottle of champagne bearing a similar label. Also, defendants argue that their product is a "classic parody" of plaintiff's champagne and thus cannot be in violation of the Lanham Act.

 The well-known standard under Rule 12(b)(6) dictates that "a district court should deny the motion 'unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote and citations omitted). The allegations in the complaint, moreover, must be liberally construed. *Dahlberg v. Becker,* 748 F.2d 85, 88 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985)." *Rauch v. R.C.A. Corporation,* 861 F.2d 29, 30 (2d Cir.1988). The purpose of a motion to dismiss under Rule 12(b)(6) is to assess the legal feasibility of the complaint, not to weigh the evidence which the plaintiff offers or intends to offer. *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir. 1984). The district court should not grant the motion simply because the possibility of ultimate recovery is remote. *Id.* at 779 (*citing Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)).

The provisions of the Lanham Act under which plaintiff seeks relief, 15 U.S.C. §§ 1114 and 1125(a), require that the trademark holder demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product. *Home Box Office v. Showtime/The Movie Channel,* 832 F.2d 1311, 1314 (2d Cir.1987); *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In general, the Second Circuit has been open to applying the Lanham Act when the products themselves are quite different, not limiting the protection of the Act to situations where similar goods compete directly with each other. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2d Cir.1981); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979). Even

---

**3.** Defendants also argue that this lawsuit should be transferred to Florida, because this Court does not have the power to fashion nationwide injunctive relief under New York law. Thus if the only count of the complaint to survive in this lawsuit was under the New York anti-dilution statute, New York General Business Law, § 368–d, defendants allege that a multiplicity of

actions would become necessary to secure nationwide relief. Though this issue could fit in under the rubrics of "efficiency" or "convenience" in deciding on transfer under 28 U.S.C. 1404(a), the Court declines to weigh or consider the issue of nationwide enforcement of a potential injunction at this time.

when the goods are markedly different, "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, supra,* 604 F.2d at 205.

To establish a claim for unfair competition under New York common law, the plaintiff must likewise demonstrate the potential for consumer confusion. *Habitat Design Holdings Ltd. v. Habitat, Inc.,* 436 F.Supp. 327, 334 (S.D.N.Y.1977), *modified and aff'd without opinion,* 573 F.2d 1290 (2d Cir.1978). Thus this Court will employ the same analysis to consider defendants' motion to dismiss both the federal statutory claims and the New York common law claims.

In determining whether consumer confusion between the two products exists, the Second Circuit has considered eight separate factors first articulated by Judge Friendly nearly thirty years ago. The factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the parties' marks; (3) the likelihood that the senior or established user of the mark will bridge the gap and sell the defendant's product; (4) the proximity between the parties' products; (5) the intent of the defendant in adopting its mark; (6) the evidence of actual confusion; (7) the quality of the defendant's product; and (8) the sophistication of the customers. *Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486, 489–93 (2d Cir. 1988); *Polaroid Corporation v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

Applying these factors to the case at bar, it is clear that plaintiff has alleged a proper claim for trademark infringement. Plaintiff's trademark was established in 1936 and has been officially registered. Upon initial examination of the two products, one is immediately struck by their similarity. The labels on both bottles are the same size, shape and color. Most importantly, the name of defendants' product is highly suggestive of plaintiff's champagne. Plaintiff has demonstrated through its pilot survey that actual confusion as to the source of Dom Popignon does exist amongst consumers. Approximately 46% of consumers asked thought that the distributors of Dom Popignon had received some sort of permission to market their product.

The question of whether consumer confusion exists is factual by nature. *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 116 (2d Cir.1984), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983). "Nonetheless, 'courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make the factual determination whether there is a likelihood of confusion as to source.' *Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 246 (2d Cir.1983)." *Universal City Studios, supra,* 746 F.2d at 116. For purposes of a Rule 12(b)(6) motion, the Court accepts the facts as alleged in the complaint and need only conclude that a legal claim exists based on those facts. In the case at bar, plaintiff has clearly alleged facts and stated a legal theory under which recovery may be obtained.

Defendants argue that their product is a "classic parody" of plaintiff's product and therefore "cannot" be in violation of the Lanham Act. As plaintiff correctly points out, this is not a correct statement of the law. An authority on trademark law has written:

> In a traditional trademark infringement suit founded on the likelihood of confusion rationale, the claim of parody is not really a separate "defense" as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to source, sponsorship or approval.

McCarthy, *Trademarks and Unfair Competition* (2d ed. 1984) § 31:38 at 667. Courts in this Circuit have considered the ramifications of parody in terms of the factors set out above—more specifically, in terms of whether the products are similar and whether actual consumer confusion

could exist as to the source of the allegedly infringing product. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 116 (2d Cir.1984) (in granting the defendants' motion for summary judgment, the Court wrote: "Indeed, the fact that Donkey Kong so obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of customers." *Id.*); *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd.,* 634 F.Supp. 1468, 1477 (S.D.N.Y.1986) (in denying a preliminary injunction, the Court wrote: "The strength of this parody highlights the differences between the two products and should further dispel any confusion on the part of consumers that plaintiffs manufactured, authorized, sponsored, or were in any way connected to the t-shirts." *Id.*).

When satire or parody is taken to a certain degree therefore, it becomes clear that the owner of the trademark was not involved in the manufacture or sponsorship of the defendant's product. Cases involving novelty items are the best examples of parody precluding any possibility for consumer confusion. *See American Express Co. v. Vibra Approved Laboratories Corp.,* No. 87 Civ. 8840, 1989 WL 39679 (S.D.N.Y. April 19, 1989) (replica of American Express card containing condom did not infringe on plaintiff's trademark); *Universal City Studios, Inc. v. T-Shirt Gallery, Ltd., supra,* 634 F.Supp. 1468 ("Miami Mice" T-shirt did not create confusion with plaintiff's popular television show); *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785 (E.D.N.Y.1983) (humorous stickers illustrating box of tea bags labelled "Petley" did not infringe on plaintiff's trademark).

■ In the case at bar, defendants' product is not a sufficiently strong parody to destroy the potential for consumer confusion. Defendants' product has a functional use and is not so outlandish as to distinguish itself from plaintiff's champagne. As stated above, plaintiff has stated a valid cause of action, and a jury should be allowed to weigh the facts and determine ultimate relief. Defendants' motion to dismiss the first three counts of the complaint under Fed.R.Civ.P. 12(b)(6) is denied.

## CONCLUSION

Defendants' motions to dismiss the complaint against defendant John Calderaio for lack of personal jurisdiction, to dismiss the case for improper venue, to transfer the case to another jurisdiction, and to dismiss the first, second, and third counts of the complaint for failure to state a claim upon which relief may be granted under Fed.R. Civ.P. 12(b)(6) are denied in their entirety.

SO ORDERED