108 F.3d 338
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
MCA RECORDS INC., Plaintiff-Appellee,
v.
CHARLY RECORDS LTD; Charly Holdings, Inc.; Charly
International APS, Defendants-Appellants.
 No. 95-56250.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 3, 1996.
Decided Feb. 21, 1997.
 
 1
 Before: BRUNETTI and RYMER, Circuit Judges, and TANNER,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Plaintiff MCA Records, Inc., brings this trademark action against three foreign corporations. The district court entered default judgments against all three defendants. On appeal, the only issue raised by Defendants is whether the district court's jurisdiction over them was exercised in accordance with the Due Process Clause. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm the judgment of the district court.
 
 FACTS AND PROCEEDINGS BELOW
 
 4
 This lawsuit arises out of a dispute over the ownership of the "Chess Masters," a collection of over 20,000 American rhythm and blues recordings from 1947-1975. In 1985, Plaintiff MCA Records, Inc., a California corporation, purchased perpetual, worldwide rights in the Chess Masters from Sugarhill Records, Inc. As part of the agreement, MCA acquired the exclusive rights to the "Chess" trademarks, which MCA proceeded to register with the U.S. Patent and Trademark Office.
 
 
 5
 Defendants are three related foreign corporations. Charly Holdings, Inc. ("Holdings") is the parent company of both Charly International, APS ("International") and Charly Records Ltd. ("Records"). A Panamanian corporation with offices in Panama and Switzerland, Holdings is involved in the business of acquiring rights to catalogs of recordings. In 1987, Holdings purportedly purchased nonexclusive worldwide rights to the Chess trademarks and Chess Masters recordings from Red Dog Express, Inc., a Louisiana corporation.[1]
 
 
 6
 International, a wholly-owned subsidiary of Holdings, is a licensing company incorporated under the laws of, and based in, Denmark. After Holdings acquires the rights to recordings, it licenses them to International, which then sublicenses them to various record manufacturers and wholesalers. In accordance with this arrangement, Holdings granted to International a worldwide license to its Chess catalog.
 
 
 7
 Records, another wholly-owned subsidiary of Holdings, is an English company, with offices in London, engaged in the record manufacturing and distribution business. Pursuant to agreement, International sublicensed its rights in the Chess catalog and Chess trademarks to Records, which proceeded to manufacture and distribute the Chess recordings using the Chess trademarks.
 
 
 8
 In 1992, MCA brought this action against the three Charly entities alleging claims for trademark and various state-law violations and seeking declaratory, injunctive, and monetary relief. Records was served first and moved to dismiss the action for lack of personal jurisdiction. The district court denied Records' motion, finding that MCA had made a prima facie showing of jurisdiction. After Records unsuccessfully sought certification for an interlocutory appeal from this ruling, it failed to answer the complaint and its default was entered. Records now claims to have defaulted because anything else would have been deemed a "voluntary submission" to the district court's jurisdiction under English law. Records believes that, so long as it does not defend on the merits, any judgment will not be enforceable in England because under English law the district court clearly lacked jurisdiction.
 
 
 9
 Holdings and International filed answers in which they challenged personal jurisdiction. They did not, however, make a motion to dismiss. Prior to trial, the district court granted MCA's motion for summary judgment on its declaratory relief claim, ruling that Holdings and International "do not now have, and never have had, any right, title, or interest in and to the Chess Masters, and MCA has the exclusive right, title, and interest in and to the Chess Masters." MCA's remaining claims proceeded to trial before a jury.
 
 
 10
 At the conclusion of MCA's case, Holdings and International moved for judgment as a matter of law on several grounds, including lack of personal jurisdiction. The district court denied their motion. At the conclusion of the trial, the jury returned a general verdict in MCA's favor, awarding damages against Holdings in the amount of $3.6 million and against International in the amount of $400,000.
 
 
 11
 Because the jury improperly considered record sales outside the United States in reaching its verdict, the district court granted Holdings and International a new trial on the issue of damages. Prior to the retrial, Holdings and International unsuccessfully sought certification from the district court for an interlocutory appeal of its jurisdictional ruling, and unsuccessfully petitioned this Court for a writ of mandamus. Holdings and International then decided to default rather than defend the retrial.[2]
 
 
 12
 On July 27, 1995, the district court entered a judgment granting MCA declaratory and injunctive relief and awarding MCA: $5,114,416 to be recovered from all three Charly defendants, jointly and severally; $1,199,678 to be recovered from Holdings and International, jointly and severally; and $2,057,598 in punitive damages plus reasonable attorneys' fees against Records. The Charly defendants appeal from this judgment, challenging only the district court's exercise of personal jurisdiction.
 
 DISCUSSION
 
 13
 Defendants contend that the district court's exercise of personal jurisdiction over them violated the Fourteenth Amendment Due Process Clause.[3] Due process requires that a defendant have certain minimum contacts with the forum state before a court may exercise jurisdiction over the defendant. "The overriding constitutional principle is that maintenance of an action in the forum must not offend 'traditional conception[s] of fair play and substantial justice.' " Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir.1990) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)). The defendant's "conduct and connection with the forum State" must be such that the defendant "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Sher, 911 F.2d at 1361.
 
 
 14
 Personal jurisdiction may be either "general" or "specific." General jurisdiction may apply "whe[n] a defendant's activities in the state are 'substantial' or 'continuous and systematic,' even if the cause of action is unrelated to those activities." Sher, 911 F.2d at 1361 (quoting Data Disc, Inc. v. Systems Tech. Assoc., 557 F.2d 1280, 1287 (9th Cir.1977)). When a defendant's contacts with the forum state are not sufficiently substantial to invoke general jurisdiction, specific jurisdiction may nevertheless be invoked if the contacts the defendant does have give rise to the cause of action being asserted. Id.
 
 
 15
 This Circuit uses a three part test for analyzing whether the exercise of specific jurisdiction satisfies the requirements of due process:
 
 
 16
 (A) some action must be taken whereby defendant purposefully avails himself or herself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws;
 
 
 17
 (B) the claim must arise out of or result from defendant's forum-related activities; and
 
 
 18
 (C) exercise of jurisdiction must be reasonable.
 
 
 19
 Id.
 
 
 20
 While a plaintiff ultimately bears the burden of proving by a preponderance of the evidence that jurisdiction is appropriate, at the motion to dismiss stage a plaintiff need only make a prima facie showing of jurisdictional facts. Id. Because Records defaulted after the district court denied its motion to dismiss, MCA need only have made a prima facie showing of jurisdiction over Records. Because Holdings and International proceeded to trial, the evidence presented at trial must have demonstrated, by a preponderance of the evidence, that jurisdiction was properly exercised over Holdings and International. The district court's factual findings must be accepted unless clearly erroneous, but the ultimate question of whether personal jurisdiction was properly exercised is a question of law reviewed de novo. Reebok Int'l, Ltd. v. McLaughlin, 49 F.3d 1387, 1390 (9th Cir.), cert. denied, 116 S.Ct. 276 (1995); Gray & Co. v. Firstenberg Machinery Co., 913 F.2d 758, 760 (9th Cir.1990).
 
 I. Charly Records
 A. Contacts
 
 21
 Records' California contacts asserted by MCA are of two types: sales and advertising.
 
 1. Sales
 
 22
 a. to "Down Home"/"Roots and Rhythm"
 
 
 23
 MCA submitted the deposition of Franklyn Scott, the president and vice-president of Roots and Rhythm, Inc. and formerly an officer of Down Home Music, Inc. Roots and Rhythm and Down Home are a mail order and retail record business, respectively, and both are located in El Cerrito, California. Scott testified that Down Home (and later Roots and Rhythm) had been selling Charly recordings in California since the formation of Charly in the 1970s. Charly Records, Ltd. was incorporated in 1981 and began releasing Chess recordings in August 1988. Since that time, Charly Records' recordings, including Chess recordings, have been among those sold by Down Home in California.
 
 
 24
 Prior to 1988, Down Home bought its Charly products from a company called Street Level Trading Co. Although MCA submitted evidence indicating that Street Level was not completely independent from Records, this evidence is largely irrelevant because Records did not produce Chess recordings until August 1988. About that time (August 1988), and lasting until early 1990, Street Level and Records began having problems. When Street Level and Records were having problems, Down Home would purchase directly from Records in London. Included among these direct purchases were seventeen Chess recordings (totalling pounds sterling59.50) ordered on September 19, 1988, and fourteen Chess recordings (totalling pounds sterling49.00) ordered on November 25, 1988.
 
 
 25
 In early 1990, Street Level and Records terminated their relationship. In an April 11, 1990 letter, Records informed Down Home that it should thereafter order directly from Records, with the "export invoicing" to be handled by Expan Marketing, Ltd. At the time of Scott's deposition in April 1992, Roots and Rhythm continued to place orders directly with Records, which would then fill the orders via Expan Marketing. Orders from May 7, 1990 to February 4, 1992, indicate that Down Home ordered over 452 Chess recordings directly from Records.
 
 
 26
 b. to "Tower Records"
 
 
 27
 MCA also submitted the declaration of Harvey Geller, one of MCA's attorneys, who declared that on May 24, 1991, he bought two Records recordings, one of which was from the Chess Masters, at a Tower Records store in West Hollywood, California. No evidence was presented as to how the recordings made their way to California.
 
 2. Advertisements
 
 28
 a. Billboard Ad
 
 
 29
 Billboard Magazine is a weekly music industry magazine distributed worldwide, including in Southern California. In the November 30, 1991 edition, in an advertising supplement devoted to a company called "Media 7," was an ad that stated, "CHARLY RECORDS CELEBRATES 10 YEARS OF JOY WITH MEDIA 7!" Below the statement was pictured four Charly products, including a collection by Chuck Berry containing Chess recordings and depicting the Chess trademark. Records contends that Media 7 is a French distribution company and that Records placed the ad with Billboard Ltd. (a British company) with the intent of reaching customers in France.
 
 
 30
 b. the Catalog
 
 
 31
 Records distributed a catalog of its products. The 1991 catalog included numerous products containing Chess recordings. Records printed an offer to sell the catalog for $3 on the back of its CDs, at least some of which found their way to Southern California. Records also sent several hundred copies to Down Home and Roots and Rhythm in California, which would distribute them to their customers. The customers could then order anything in the catalog from Roots and Rhythm. Finally, Records mailed a few of its catalogs to California residents.
 
 
 32
 c. other promotional material
 
 
 33
 About once a month, Records also sent letters and other promotional material to Down Home. Included among this material was a new release list containing Chess recordings, a promotional letter touting Chess recordings, and brochures advertising Chess recordings.
 
 B. General Jurisdiction
 
 34
 Records' contacts with California are not of a sufficiently substantial nature to justify the exercise of general jurisdiction. See Helicopteros Nacionales de Columbia S.A. v. Hall, 466 U.S. 408, 410-11, 418-19 (1984) (holding no general jurisdiction despite sales negotiations, purchasing of equipment, and training of personnel in forum state).
 
 C. Specific Jurisdiction
 1. Purposeful Availment
 
 35
 The purposeful availment requirement is satisfied if the defendant has "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." Sinatra v. National Enquirer, Inc., 854 F.2d 1191, 1195 (9th Cir.1988). It is "designed to ensure that the defendant is not haled into court as the result of random, fortuitous or attenuated contacts, or on account of the unilateral activities of third parties." Shute v. Carnival Cruise Lines, 897 F.2d 377, 381 (9th Cir.1990), rev'd on other grounds, 499 U.S. 585 (1991). As noted by the court in Sinatra, "the solicitation of business in the forum state that results in business being transacted or contract negotiations will probably be considered purposeful availment." Sinatra, 854 F.2d at 1195; see also Shute, 897 F.2d at 382-83 (holding that advertising, conducting promotional seminars, and paying commission on sales within the forum state were "more than sufficient to meet the purposeful availment test").
 
 
 36
 Records has purposefully availed itself of the privilege of conducting business in California. It advertised, promoted, and sold its products directly to Down Home Records in El Cerrito, California. While Records contends that the Chess products it sold to Down Home were inconsequential (amounting to a total of pounds sterling108.50 or $170.00 over an eighteen-month period prior to April, 1990), Records fails to acknowledge that Down Home continued to place substantial orders with Records after April, 1990. Although Expan Marketing Ltd. may have filled Down Home's orders during this period, the evidence indicates that the orders were placed directly with Records. Thus it was Records' affirmative conduct, and not solely the unilateral activity of Expan, that was responsible for selling Records' products to Down Home after April, 1990. Moreover, it was reasonable for the district court to find that the products sold included over 452 Chess recordings during this period.
 
 
 37
 Even apart from these sales, Records directly promoted its products, including its Chess products, to Down Home in California. Although the Billboard ad and the catalog offer printed on the back of Records' CDs likely made their way to California through the conduct of third parties (and are therefore insufficient to establish purposeful availment), the advertising materials Records sent to Down Home, including catalogs, brochures, and letters, are more than sufficient to demonstrate an affirmative effort on the part of Records to market its products in California. Included among these products were those derived from the Chess Masters.
 
 
 38
 The evidence submitted by MCA is more than sufficient to make a prima facie showing of "purposeful availment" on the part of Records.
 
 2. Arising Out Of
 
 39
 This Circuit applies a "but for" test to determine whether a claim arises out of a defendant's forum-related activities. Ballard v. Savage, 65 F.3d 1495, 1500 (9th Cir.1995). Records does not contend that the arising out of requirement is not met. But for Records advertisement and sale of Chess recordings, MCA's rights in those recordings and related trademarks would not have been infringed. Because some of the advertisement and sales activity was directed to California, MCA's claims arise out of this forum-related activity. See generally Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780-81 (1984) (recognizing that a defendant may sue in any forum with which the defendant has minimum contacts and may seek recovery for damages suffered in other forums); Vencedor Mfg. Co. v. Gougler Industries, Inc., 557 F.2d 886, 892 (1st Cir.1977) (fact that defendant's sales in forum were less than .5 percent of its total sales volume is irrelevant, so long as its sales there are part of a "regular course of dealing, and are not isolated or exceptional events").
 
 3. Reasonableness
 
 40
 Because Records' contacts satisfy the purposeful availment requirement, personal jurisdiction is presumptively reasonable. Sher, 911 F.2d at 1364. The burden falls on Records to present a compelling case that the exercise of jurisdiction would be so unreasonable as to violate due process. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985); Sher, 911 F.2d at 1364. In determining the reasonableness of jurisdiction, this Circuit has identified the following factors to consider: the extent of the defendant's purposeful interjection into the forum state; the burden on the defendant of defending in the forum state; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in adjudicating the dispute; the most efficient forum for judicial resolution of the dispute; the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and the existence of an alternative forum. Sher, 911 F.2d at 1364; Sinatra, 854 F.2d at 1198-99.
 
 
 41
 a. extent of purposeful interjection
 
 
 42
 The purposeful interjection factor is analogous to the purposeful availment factor discussed above. Sinatra, 854 F.2d at 1199; see Corporate Investment Business Brokers v. Melcher, 824 F.2d 786, 790 (9th Cir.1987) ("Ninth Circuit cases give the 'purposeful interjectment' factor no weight once it is shown that the defendant purposefully directed its activities to the forum state...."). It does not weigh against jurisdiction.
 
 
 43
 b. burden on the defendant
 
 
 44
 Records makes no argument as to why the exercise of jurisdiction would be burdensome. While defending oneself in a foreign country should be accorded "significant weight" in assessing the reasonableness of jurisdiction, Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 114 (1987), "modern advances in communication and transportation have significantly reduced the burden on litigating in another country." Sinatra, 854 F.2d at 1199. In the absence of a developed argument as to why the exercise of jurisdiction would be unreasonably burdensome on Records, this factor should not weigh against jurisdiction.
 
 
 45
 c. conflict with sovereignty of defendant's state
 
 
 46
 The Supreme Court has cautioned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." Asahi, 480 U.S. at 115 (citation omitted); see also FDIC v. British-American Ins. Co., 828 F.2d 1439, 1444 (9th Cir.1987) (stating that litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because of important sovereignty concerns). English sovereignty will not be undermined by this action, however, for MCA asserts claims based on Defendants' violation of MCA's rights in the United States under United States trademark law, and seeks recovery of only those damages incurred in the United States. As Records' own British solicitor acknowledged, "[t]he English Court can no more determine the validity of claims for infringement of USA Trademark than this Court could such claims in respect of English Trademarks." While Records points to its decision to default rather than defend this action as evidence of the conflict with English sovereignty, its decision was merely a strategic one made after the district court's finding of jurisdiction, and does not reflect an actual conflict with English sovereignty.
 
 
 47
 d. California's interest
 
 
 48
 "California maintains a strong interest in providing an effective means of redress for its residents tortiously injured by commercial misappropriation." Sinatra, 854 F.2d at 1200. As MCA is a California corporation with its principle place of business in California and is alleging tortious interference with its commercial property rights, California's interest weighs in favor of jurisdiction.
 
 
 49
 e. efficiency and effectiveness of forum
 
 
 50
 MCA can only obtain effective relief for the alleged infringement of its federally-protected trademark rights in the United States. Within the United States, California is the most efficient forum because it is where most of MCA's witnesses are located.
 
 
 51
 f. existence of an alternative forum
 
 
 52
 Records has failed to identify any other forum available for redressing the harm to MCA's federally-protected trademark rights caused by Records' alleged sales of infringing recordings in the United States. In any event, "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable." Sinatra, 854 F.2d at 1201 (citation omitted).
 
 
 53
 Taking all of the factors as a whole, Records has failed to demonstrate that the exercise of specific jurisdiction is so unreasonable as to violate due process. By advertising and selling allegedly infringing products in California, Records should reasonably expect to be haled into a California court to defend an infringement action.
 
 II. Charly Holdings and Charly International
 A. Contacts
 1. Licensing
 
 54
 Holdings purported to acquire worldwide rights to the Chess Masters and trademarks from Red Dog Express, Inc., a Louisiana corporation. Pursuant to the acquisition agreement, Chess Masters were physically delivered from the United States to Holdings. Charly Holdings then purported to license worldwide rights to the Chess Masters and trademarks to International, its wholly-owned subsidiary. International in turn conveyed Chess Masters to Records and granted Records the nonexclusive right to market the Chess Masters in the United Kingdom and Eire. There is no evidence that International at any time licensed Records to distribute the Chess Masters in the United States. As part of the license agreements, both Holdings and International received royalties on each unit sold by Records.
 
 
 55
 Apart from its deal with Records, International also licensed rights in the song "White Cliffs of Dover," one of the Chess Masters, for worldwide use in the motion picture "The Crying Game." The film was exhibited in California, and International received on-screen credit for licensing the rights to the song. Additionally, the song was contained in the soundtrack album, which was sold in California.
 
 2. Florida Flyer
 
 56
 Someone distributed a flyer at a national music conference held in Florida in March of 1993 that contained the Chess trademark and stated, "Charly International your safe source for Chess, Argo, Cadet. Call us collect...."
 
 3. Names on Recordings
 
 57
 Some of the CDs sold by Records in California gave credit to Holdings and/or International on the back cover. Sometimes there would be a circled "p" or "c" next to Holdings' name. MCA contends that these marks evidenced Holdings' claim to United States copyright protection for its allegedly infringing Chess recordings.
 
 B. General Jurisdiction
 
 58
 Holdings' and International's contacts fall well short of that required for general jurisdiction.
 
 C. Specific Jurisdiction
 1. Purposeful Availment
 
 59
 In determining whether Holdings or International have purposefully availed themselves of the privilege of conducting business in California, only their own contacts that are relevant. Because the corporate separation between Holdings and International is real, the contacts of one may not be imputed to another, even though they are related. Transure, Inc. v. Marsh and MacKennan, Inc., 766 F.2d 1297, 1299 (9th Cir.1985).
 
 
 60
 Many of the contacts identified by MCA provide no support for a finding of purposeful availment. Holdings' purported purchase of the Chess Masters from a Louisiana corporation clearly does not qualify as a contact with California. Likewise, although MCA makes much of the fact that Holdings' name was found on the back of numerous CDs distributed in California, there is no evidence that Holdings (and not Records) was responsible for including it there. As for International's license to Records, it cannot support jurisdiction because it specifically excluded the United States from its territory. Lastly, the flyer International distributed in Florida cannot support a finding of purposeful availment without evidence that negotiations with a California buyer resulted.
 
 
 61
 Holdings' license to International and International's license to the makers of "The Crying Game" do, however, satisfy the purposeful availment requirement. Trademark infringement is a commercial tort. See Int'l Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912, 915 (9th Cir.1980), cert. denied, 452 U.S. 941 (1981) (noting that Lanham Act protects against two types of "the broad business tort of 'unfair competition' "). One who intentionally directs a tort at a forum's resident is ordinarily subject to jurisdiction in the forum state. Calder v. Jones, 465 U.S. 783, 788-90 (1984); see Core-Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482, 1492 (9th Cir.1993) (Wallace, C.J., dissenting); Brainerd v. Governors of the University of Alberta, 873 F.2d 1257, 1258-59 (9th Cir.1989); see also Lipton v. The Nature Co., 781 F.Supp. 1032, 1036 (S.D.N.Y.1992) ("The licensor of an infringing trademark commits a predicate tort for the purpose of New York long-arm jurisdiction by the act of licensing, and may be held accountable in New York.").
 
 
 62
 Holdings and International argue that the brunt of the injury, if any, was not felt in California because only a small number of Chess recordings were actually sold in California. However, while some courts have held that the tort of trademark infringement occurs where the defendant sells or attempts to sell the offending product, e.g. Schieffelin & Co. v. Jack Co. of Boca, Inc., 725 F.Supp. 1314, 1318 (S.D.N.Y.1989), the brunt of the injury is nevertheless borne by the alleged trademark owner where the owner resides. So long as Holdings and International were aware of MCA's rights in the Chess Masters and trademarks, knew that MCA was a California corporation, and knew that their licensing of the Masters and trademarks would result in infringing products being distributed in the United States, a finding of purposeful availment is appropriate under Calder.
 
 
 63
 The evidence presented at trial would support the district court finding all of these facts by a preponderance of the evidence. Bruce Resnikoff, the senior vice-president and general manager of special markets and products at MCA, testified that MCA's acquisition of the Chess Masters in 1985 was publicized in virtually every music periodical in the world, as well as in non-music press. Additionally, Resnikoff testified that someone from MCA contacted Charly Holdings on more than one occasion and informed them that they were infringing MCA's rights in the Chess Masters. From this testimony, the district court could reasonably infer that Holdings and International knew or should have known that MCA was a California corporation and that their licensing of the Chess Masters would infringe MCA's rights. Additionally, the district court could reasonably infer from the licensing agreements that Holdings and International should have known that their licensing of the Chess Masters and trademarks would result in infringing products being distributed in the United States. Thus, Calder applies and the purposeful availment requirement is met.
 
 
 64
 We recognize that, were Holdings and International not guilty of an intentional tort, the commercial aspects of their activities--granting a worldwide, nonexclusive license--would most likely be insufficient to establish purposeful availment in California. However, because Holdings and International have committed an intentional tort knowing that the effects would be borne by a California resident, the purposeful availment requirement is satisfied.
 
 2. Arising Out Of
 
 65
 As with Records, Holdings and International do not contend that the "arising out of" requirement is not met. But for their licensing of the Chess Masters, infringing products would not have been distributed in the United States.
 
 3. Reasonableness
 
 66
 a. extent of purposeful interjection
 
 
 67
 In the case of an intentional tortfeasor purposefully directing its actions at a California resident, this factor weighs in favor of jurisdiction.
 
 
 68
 b. burden on the defendant
 
 
 69
 As with Records, Holdings and International make no argument as to why the exercise of jurisdiction would be burdensome. As with Records, this factor does not weigh against jurisdiction in the absence of such an argument.
 
 
 70
 c. conflict with sovereignty of defendant's state
 
 
 71
 Citing Rano v. Sipa Press, Inc., 987 F.2d 580 (9th Cir.1993), Holdings and International argue that jurisdiction over them would be unreasonable because they are foreign licensors who licensed the Chess Masters on a worldwide basis to foreign licensees. If a California court has jurisdiction over them, they argue, it also "has jurisdiction over every artist, performer, and author in the world, as well as every other entity in the long chain of licensing and production."
 
 
 72
 Rano was a professional photographer and citizen of Great Britain who licensed his photographs to a French corporation, Sipa Press, which then sublicensed the photographs to magazine publications and other users. Id. at 583. Sometime after Rano and Sipa Press had a business disagreement, Rano moved to California and canceled the license agreement. Id. at 583, 588. Eventually, Rano sued Sipa Press and its owner, Sipahioglu, for copyright infringement in California. Id. at 583. Sipahioglu moved to dismiss for lack of personal jurisdiction, the district court granted the motion, and we affirmed. Id. at 587-88. Although Sipahioglu was alleged to have caused and profited from Sipa's licensing of the photographs to magazine publications Sipahioglu knew would be distributed in California, this was not enough. Id. at 588. The court reasoned that the photographer's argument, if accepted, "would render Sipahioglu, and other foreign owners of art who sell their products to publications, amenable to personal jurisdiction in every state in which their art is eventually displayed." Id. Relying on the fact that "litigation against an alien defendant requires a higher jurisdictional barrier than litigation against a citizen from a sister state," the court found jurisdiction to be lacking. Id. (citing Pacific Atlantic Trading Co. v. M/V Main Express, 758 F.2d 1325, 1330 (9th Cir.1985) ("foreign-acts-with-forum-effects jurisdictional principle must be applied with caution, particularly in an international context") (citations and internal quotations omitted)).
 
 
 73
 Defendants' reliance on Rano is unavailing for two reasons. First, the plaintiff in Rano never raised a Calder -type tort argument to establish personal jurisdiction. Moreover, unlike MCA, which has always been a resident of California, Rano was a citizen and resident of Great Britain at the time the license agreement with Sipa Press was formed. Thus, Sipahioglu would reasonably anticipate that any dispute arising out of the agreement would be settled in Europe. See Rano, 987 F.2d at 588 ("Sipahioglu could not have foreseen Rano's fortuitous move from Europe to California.").
 
 
 74
 Because Holdings and International purposefully directed their tortious activities at a California resident, any potential conflict with the sovereignty of Defendants' state does not weigh against jurisdiction.
 
 
 75
 d. California's interest
 
 
 76
 California maintains a strong interest in providing an effective means of redress for its residents tortiously injured by commercial misappropriation.
 
 
 77
 e. efficiency and effectiveness of forum
 
 
 78
 MCA can only obtain effective relief for the alleged infringement of its federally-protected trademark rights in the United States. If jurisdiction is found to be lacking, a foreign licensor of worldwide rights to a foreign licensee could never be held accountable in the United States even if it knew that the infringing product was likely to be distributed in the United States and would infringe a United States resident's rights.
 
 
 79
 f. existence of an alternative forum
 
 
 80
 As with Records, Holdings and International have failed to identify any other forum available for redressing the harm to MCA's federally-protected trademark rights caused by the effects of their allegedly tortious activities in the United States.
 
 
 81
 Taking all of the factors as a whole, Holdings and International have failed to demonstrate that the exercise of specific jurisdiction is so unreasonable as to violate due process. By licensing products they knew would eventually be distributed in the United States and would infringe a California resident's rights, Holdings and International should reasonably expect to be haled into a California court to defend an infringement action.
 
 CONCLUSION
 
 82
 The exercise of jurisdiction over the three Charly Defendants was proper. Accordingly, we affirm the judgment of the district court.
 
 
 83
 AFFIRMED.
 
 RYMER, Circuit Judge, dissenting:
 
 84
 I agree with all that the majority holds except for its conclusion that MCA demonstrated, by a preponderance of the evidence as it had to do, that Charly Int'l and Charly Holdings "purposefully" availed themselves of the California forum by intentionally committing torts outside of California knowing and intending that the brunt of the economic injury would be borne by MCA, a California corporation.
 
 
 85
 To me, this is not a Calder case. Because Shirley Jones was who she was--a famous entertainer who lived and worked in California and was libeled by a story in the National Enquirer, which was published in Florida but had a nationwide circulation with a large audience in California--the Court could easily hold in Calder that California was the "focal point both of the story and of the harm suffered" and so jurisdiction in California based on the "effects" of the defendants' Florida conduct was proper. Calder v. Jones, 465 U.S. 783, 789 (1984). Likewise in Brainerd v. Governors of the Univ. of Alberta, 873 F.2d 1257 (9th Cir.1989), Arizona was the focus of the libel and the harm, as the former (out-of-the-country) employer of a professor at the University of Arizona told a dean at Arizona some allegedly libelous things. Unlike either Calder or Brainerd, there is no evidence in this case to support a finding that "intentional, and allegedly tortious, actions were expressly aimed at California." Calder, 465 U.S. at 789.
 
 
 86
 Nor do I believe that MCA has shown that the brunt of its harm was suffered in California just because it is incorporated here, as "[a] corporation does not suffer harm in a particular geographic location in the same sense that an individual does." Core-Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482, 1486 (9th Cir.1993). Otherwise, any foreign company accused of trademark infringement could be sued whereever the domestic company is incorporated.
 
 
 87
 For these reasons, I would reverse as to Charly Int'l and Charly Holdings.
 
 
 
 *
 Hon. Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 In an action brought by MCA, the Los Angeles Superior Court determined that Red Dog and its owner, Marshall Sehorn, never in fact had any rights to the Chess Masters. MCA Records, Inc. v. Marshall Sehorn, No. BC002490 (LASC Sept. 11, 1992)
 
 
 [2]
 Apparently, Holdings and International decided to default for the same reason as Records
 
 
 [3]
 Although the exercise of personal jurisdiction must also have comported with California's personal jurisdiction rule, California's rule is "coextensive with the outer limits of due process...." Data Disc, Inc. v. Systems Tech. Assoc., 557 F.2d 1280, 1286 (9th Cir.1997). A due process analysis is therefore determinative of whether the exercise of jurisdiction was proper