SCHIEFFELIN & CO., Plaintiff,

v.

The JACK COMPANY OF BOCA, INC., and John P. Calderaio, individually and doing business as The Jack Co., Inc., Defendants.

No. 89 Civ. 2941 (BN).

United States District Court, S.D. New York.

March 31, 1994.

Robin, Blecker, Daley & Driscoll, New York City, for plaintiff; Marie V. Driscoll, Douglas A. Coblens, of counsel.

Scully, Scott, Murphy & Presser, Garden City, NY, for defendants; John S. Sensny, Kenneth L. King, of counsel.

Law Office of Harry W. Barron, Boca Raton, FL, for defendants; Harry W. Barron, of counsel.

### OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

BERNARD NEWMAN, Senior Judge: [1]

Schieffelin & Co. brings this action for trademark infringement, common law unfair competition, trade dress infringement and trademark dilution in connection with defendants' marketing of a popcorn product under the mark "DOM POPINGNON—CHAMPOP". Schieffelin holds federally registered and incontestible trademarks in the phrase "CUVÉE DOM PÉRIGNON" and in a shield design label appearing on the front of its champagne bottles. Defendants' product, also sold in champagne bottles, is identified by a shield design label that bears a close physical resemblance to Schieffelin's label.[2]

Specifically, Schieffelin's complaint sets forth four separate causes of action: (1) infringement of Schieffelin's federally registered trademarks in violation of section 32 of the Federal Trademark Act (the "Lanham Act"), 15 U.S.C. § 1114(1) (1988); (2) false designation of the source and origin of the DOM POPINGNON product in violation of section 43(a) of the Act, 15 U.S.C. § 1125(a); (3) unfair competition under the common law of the State of New York; and (4) trademark dilution in violation of the New York "anti-dilution" statute, New York General Business Law, § 368–d (McKinney 1986 & Supp.1994).

Prior to trial, defendants moved to dismiss the complaint for lack of personal jurisdiction, improper venue, and on the ground that, as to several counts in the complaint, Schieffelin had failed to state a claim upon which relief could be granted, because defendants' product was a "classic" parody. The court denied defendants' motion, holding in particular that the Champop product was not so obvious a parody as to permit dismissal under Fed.R.Civ.P. 12(b)(6); rather, whether the parody would be sufficiently strong to overcome the potential for consumer confusion was an issue of fact to be decided at trial. *See Schieffelin & Co. v. The Jack Company of Boca, Inc.,* 725 F.Supp. 1314, 1324 (S.D.N.Y.1989) (Leisure, J.) The court likewise denied a subsequent motion by defendants for summary judgment, but granted Schieffelin's motion for summary judgment as to defendants' claim that the DOM PÉRIGNON trademark had been abandoned.

### THE RECORD

The record in this case consists of, among other things, the transcript of the live testimony of twelve witnesses for Schieffelin and one witness for defendants, as well as a total of 75 exhibits.

Schieffelin presented the testimony of the following witnesses. John Pellaton, Vice

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as a United States District Judge by designation.

2. A side by side comparison of DOM PÉRIGNON champagne and DOM POPINGNON CHAMPOP

is provided in the Appendix found at the end of this opinion.

President and Product Group Director at Schieffelin & Somerset, testified concerning Schieffelin's marketing strategy for the DOM PÉRIGNON product. Richard Leventhal, President of Fedway Associates, gave additional evidence concerning the public perception of DOM PÉRIGNON. Schieffelin offered the expert testimony of Ronald Silver, President of Target Research Company, and Leonard Wood, owner of Multi–Sponsor Surveys. Silver and Wood related the results of three surveys conducted on behalf of Schieffelin to test the market recognition of DOM PÉRIGNON and the likelihood of confusion regarding the source of DOM PO-PINGNON. Schieffelin's other witnesses were: Roger Dagorn, a Master Sommelier and the maitre d' at the Chanterelle restaurant in the Tribeca section of Lower Manhattan; Laura Cooney and Renee Harwood, both of Equifax Quick Test; Jean–Louis Carbonnier, Director of Communications at the Champagne News Information Bureau; Douglas Coblens, Esq.; Seymour Adler, an investigator; Martin Beran, Esq.; and John P. Calderaio. The latter also testified on behalf of defendants.

The court has jurisdiction pursuant to 28 U.S.C. § 1338 and 15 U.S.C. §§ 1501, *et seq.* A bench trial was conducted by the writer from September 7 to 10, 1993. The following constitute the court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

Schieffelin & Co. is a Delaware corporation with an office and place of business in New York City, and is the distributor of the internationally famous champagne DOM PÉRIGNON. The corporate defendant in this action, The Jack Company of Boca, Inc., is a Florida corporation with an office and place of business in Boca Raton, Florida. John P. Calderaio, the individual defendant, is a resident of Boca Raton and owns 50% of the stock of The Jack Company, of which he is the President. Calderaio exercises full responsibility for the business decisions of The Jack Company.

Dom (Pierre) Pérignon is the name of a sixteenth century Benedictine monk at the Abbey of Hautvillers in the province of Champagne, France. It is popularly believed that Dom Pérignon, who presided over the vineyards at the abbey, discovered the method for producing the particular variety of sparkling white wine now known as champagne.

Dom Pérignon's name is part of a federally registered trademark owned by Schieffelin, and used in connection with the sale of a distinctive champagne produced by Moet & Chandon, a French producer of sparkling white wines.[3] Moet & Chandon and Schieffelin are controlled by a common parent, Moet Hennessey, France. *See* Plaintiff's Exhibit 47. Since 1936, the year when DOM PÉRIGNON champagne was initially marketed in the United States, the exclusive distribution of DOM PÉRIGNON champagne under the trademark CUVÉE DOM PÉRIGNON has been either by Schieffelin (acting on its own behalf or through a joint venture known as Schieffelin & Somerset Co.) or by a predecessor in title. Although the term "CUVÉE" is included as part of Schieffelin's federally registered trademark, the product is commonly referred to as DOM PÉRIGNON, and it is so described in restaurant menus, retail catalogs and books wherein DOM PÉRIGNON is mentioned.

In marketing DOM PÉRIGNON, Schieffelin has sought to associate its product with a conception of both scarcity and wealth. Indeed, DOM PÉRIGNON first came to the United States on the maiden voyage of the *Normandie* in 1936, where it was used to toast the New Year. Three years later, the noted French chef, Henri Soulé, served DOM PÉRIGNON champagne at the 1939 World's Fair. DOM PÉRIGNON was subsequently provided at a select number of French res-

---

**3.** As of September 11, 1981, Schieffelin owned all rights in the federally registered trademark "CUVÉE DOM PÉRIGNON", under Trademark Registration No. 820,411. *Cuvée* is the French word for vintage. Additionally, Schieffelin is the owner of the common law rights in the trademark DOM PÉRIGNON. Schieffelin also owns a trademark consisting of a shield design label, Trademark Registration No. 634,170, as well as a shield outline for champagne wines, Trademark Registration No. 847,975. Schieffelin's right of exclusive use of the above has become incontestable under federal law. *See* Plaintiff's Exhibits 16, 17, 45.

taurants, and could be obtained by retail sale only from Sherry–Lehmann's, a large wine and spirits merchant in New York. Presently, DOM PÉRIGNON is available for purchase in wine and liquor stores, as well as supermarkets and membership clubs where permitted by law. It continues, however, to enjoy an image of scarcity, despite its wide distribution in American commerce.

The testimony of Pellaton and Leventhal established that Schieffelin's champagne is used by people of all socio-economic backgrounds to celebrate major personal and commercial events. Nevertheless, DOM PÉRIGNON continues to be regarded as a distinctive and highly prestigious champagne, and is associated in the minds of the purchasing public with wealthy and famous people. Schieffelin has succeeded in cultivating DOM PÉRIGNON's aura of fame and wealth by means of a careful marketing strategy. Several bottles were donated, for example, to Presidents Bush and Mitterand, General Colin Powell and others, with the inscription "Peace through Strength," to recognize their leadership during the recent military action by the United Nations in the Persian Gulf. Schieffelin also permits United Airlines to advertise DOM PÉRIGNON in connection with its first class air passenger service.

According to Pellaton, Schieffelin does not aggressively advertise its champagne in the media; rather, it has discretely promoted the "pristine" image of its champagne by controlling the manner and context in which it is presented to the public. For example, DOM PÉRIGNON has appeared in motion pictures, such as the popular James Bond series. Permission is granted to use DOM PÉRIGNON only after review and approval of scripts by Schieffelin, which subsequently sends a representative to the set to ensure that the bottle is properly displayed, opened and used. Schieffelin also tightly controls the use of its trademarks by others, such as United Airlines, which was required on several occasions to amend its advertisements before finally obtaining approval. With the exception of United Airlines, Schieffelin routinely refuses to license or approve the use of the DOM PÉRIGNON marks by any other entity.

To illustrate its sedulous defense of its marks, Schieffelin offered into evidence an advertisement for Tagg, a fragrance for men, which had been published in the November 1988 issue of Gentlemen's Quarterly ("GQ"). In the center of the advertisement was a bottle of defendants' DOM POPINGNON product. *See* Plaintiff's Exhibit 8. Pellaton testified that Schieffelin would never authorize the use of DOM PÉRIGNON in such an advertisement, since it would be contrary to his company's marketing policy to encourage an association between Dom Pérignon and so-called "cheap products." Record at 64.

In June 1986, Calderaio was employed as a valet parker at the Boca Raton Hotel & Club, where he apparently developed a distaste for the condescension of the wealthy patrons of that establishment. Calderaio, then twenty-one and newly married, was eager to form his own company. He became aware of an enterprise which marketed a popcorn product called "Le Pop" in wine bottles. Soon thereafter, Calderaio glanced at a bottle of DOM PÉRIGNON which had been given to him and his wife as a present, and conceived of the DOM POPINGNON product line.

According to Calderaio's testimony, his intent was to create a parody of DOM PÉRIGNON, for the purpose of casting ridicule upon the tastes and pretensions of DOM PÉRIGNON purchasers:

Q: What was the association you were trying to create?

A: The association was one of mockery and one of poking fun at the very elite, that type of person, or very wealthy.... In a humorous way, in a way where somebody could get a good chuckle out of it and "make their day."

Record at 366. To that end, Calderaio coined the "DOM POPINGNON" name as a burlesque of sorts on the "CUVÉE DOM PÉRIGNON" mark, and designed a shield label that would be reminiscent of Schieffelin's label.

Calderaio assuredly achieved his goal of closely approximating the appearance of the DOM PÉRIGNON mark, as well as the shield design label. A person glancing at the DOM POPINGNON product would instantly

notice a strong similarity to DOM PÉRIG-NON.

To begin with, the script of the DOM POPINGNON mark within defendants' label resembles that of the CUVÉE DOM PÉRIG-NON mark, although the two marks are concededly not drawn in precisely the same typeface. As to the design of the two labels, both are of a gold color with black lettering and graphics. The elements of defendants' label are generally ordered in the same relative location on the DOM POPINGNON label as their corresponding elements in the DOM PÉRIGNON label, with some insignificant variations. Specifically, both designs contain a line border running at the edge of the shield, scrolling around the phrase "Fondee en", followed by a year, a vintage year, and a star in the bottom center of the label.[4] Scheiffelin's label contains the script, "Champagne", above the CUVÉE DOM PÉRIG-NON mark; in the same relative location, defendants placed the phrase "Extra Dry". Further, defendants' label contains an italic "Champop" similar to Scheiffelin's "Champagne", below the DOM POPINGNON mark.

Continuing, where Schieffelin's label features a depiction of grapevines running vertically along the sides of the shield, defendants place in the same relative location, and in roughly the same proportion, a drawing of corn stalks, arranged in a vine-like representation. Where Schieffelin's label recites, "ALC 12.5% BY VOL" AND "750 ML", defendants' label bears the designation "POP-CORN 100% BY VOL" AND "NET WT 24 OZ". Finally, whereas Schieffelin's label contains the legend "Produce of France" printed in a small type size at the lower left quadrant of the shield, just outside the border, defendants' label recites in the corresponding area and in similar print size, "Produce of Iowa." Similarly, on the opposite side of the label, where Schieffelin prints "Muselet EPARNIX", defendants indicate "The Jack Co. Inc. Boca Raton, FL". Such differences as do appear, e.g., the well-nigh microscopic disclaimer at the bottom of de-

fendants' label, can only be detected upon careful comparison and inspection.

Defendants' bottles are either identical in size to Schieffelin's bottles, or indistinguishably different in size. Both bottles bear a foil wrap around the neck and the top of the cork. Thus, it appears that defendants' overall product design was conceived with the object of closely mimicking DOM PÉRIG-NON.

Calderaio undertook to manufacture several hundred bottles of DOM POPINGNON, and demonstrated them to several potential buyers. In August 1987, Calderaio brought his popcorn to a gift show in the Merchandise Mart in Miami, Florida.

On December 22, 1987, Schieffelin contacted Calderaio through its attorney, Marie V. Driscoll, Esq. Counsel informed Calderaio, in pertinent part, as follows:

> The DOM PÉRIGNON trademark and the goodwill it represents are of great value to our client. It is obvious that your company intended to trade on the goodwill represented by that trademark. While you may have considered your use of "DOM POPPIGNON" [sic] clever and amusing, in fact it misappropriates our client's goodwill and is likely to confuse consumers into believing that your company's products are authorized or sponsored by, or are somehow affiliated with Schieffelin & Co. In addition your use of DOM POPPIGNON [sic] dilutes the value of the famous and prestigious DOM PÉRIGNON trademark.

*See* Plaintiff's Exhibit 53. Schieffelin demanded that Calderaio cease using the DOM POPINGNON trademark immediately and communicate to Schieffelin within five days that no further use of DOM POPINGNON mark would be made.

Calderaio thereupon retained Harry W. Barron, Esq., a specialist in patent, copyright and trademark litigation. Mr. Barron then responded to Schieffelin on behalf of defendants by letter dated December 29, 1987. *See* Defendant's Exhibit F. In that letter,

---

4. In Schieffelin's label, the vintage appears above the star; in defendants' label, the vintage appears below the star. The phrase "Hand Selected Kernels" appears at the point above the star where Schieffelin's vintage designation would appear. Thus, the variation on Schieffelin's design is minuscule.

defendants took the position that the DOM POPINGNON product was an obvious parody, and thus, consumers would not be likely to confuse defendants' product with DOM PÉRIGNON. Defendants did offer to place a disclaimer on future bottles of DOM PO-PINGNON. Barron wrote further, "[i]f this disclaimer will satisfy your client, please advise me as soon as possible so that it can be implemented without further delay." Barron concluded by informing Schieffelin that, apart from the offer of a disclaimer, defendants would refuse to comply with the demands expressed in Schieffelin's December 22, 1987 letter to Calderaio.

In January 1988, Calderaio and his brother attended a trade show at the Jacob Javitz Convention Center in New York City, where the DOM POPINGNON product was displayed in a booth. Until April 1988, orders for DOM POPINGNON were filled from the initial 1987 inventory of 1468 bottles. However, the January 1988 trade show led to many more orders for DOM POPINGNON, and it quickly became necessary to manufacture additional bottles. Concerned, however, that Schieffelin might institute legal proceedings, Calderaio contacted his attorney monthly to determine whether Schieffelin had responded to the December 19, 1987 letter. In June 1988, some six months after defendants had communicated their position to Schieffelin, counsel for defendants advised Calderaio that it appeared Schieffelin would not respond. Calderaio went about filling orders for DOM POPINGNON, and distributed the product through various sales representatives. When his supply ran out, Calderaio borrowed several thousand dollars to finance an expanded operation, and incurred additional debt to his suppliers. Thereupon, defendants purchased in excess of 20,000 new bottles and incurred indebtedness of between $45,000 and $55,000. All of the bottles involved in this order were subsequently sold (Record at 396, 417).

In early 1989, Schieffelin engaged Ronald Silver to conduct a pilot survey to measure the potential for consumer confusion between DOM PÉRIGNON and DOM POPINGNON. Since DOM POPINGNON was known to be available in certain gourmet, or specialty food stores, such as Fraser Morris or Grace's Market, the pilot survey was conducted in Manhattan, proximate to one such store, according to a "shopping intercept method." Silver drafted an initial "screener" question to identify respondents who had shopped in such stores. Respondents were asked if they had shopped in several other establishments, so that they would not be aware of the direction of the survey. Only the responses of persons who had shopped in specialty stores were considered.

The survey also eliminated people under the age of 25, predicated upon the assumption that persons in their early twenties would be unlikely to shop in a specialty store. The survey additionally excluded persons over the age of 64, under the rationale that older respondents might be handicapped in their ability to respond to the visual and auditory stimuli (e.g., reading and viewing popcorn bottles) that are crucial to the conduct of a consumer survey. The "universe" of respondents was, therefore, tailored to include consumers who would be in a position to purchase DOM PÉRIGNON as well as DOM POPINGNON. The universe was not restricted to champagne or wine drinkers only. Having thus defined the universe, Silver drafted a questionnaire, the purpose of which was to determine how many persons in that universe would make an association between DOM POPINGNON and other products, and particularly, DOM PÉRIGNON.

The survey was drafted with a view to screening out bias; for example, respondents were asked at the end of the survey whether they worked in a liquor store or other such establishment. The interviewers were not informed as to the identity of the client, the purpose of the survey or the possibility of litigation.

The pilot survey was limited to 50 respondents. The survey was not statistically projectable, and was therefore a nonprobability survey. Silver defined a "probability survey" as one in which a sample is drawn, based upon census "tracks," in which every track in the United States is given an opportunity to be selected for the survey. Record at 173. Thus, in a true probability survey, the surveyor is "giving everyone in a defined uni-

verse an opportunity to qualify and participate for the study." Record at 180. Although such a survey may be conducted over the telephone with ease, it would have been virtually impossible in this case; because a display of the DOM POPINGNON bottle would not have been possible over the telephone, and was an indispensable element of the survey. Moreover, any other method of tracking the appropriate segments of the population would necessarily have involved considerable expense.

In the pilot survey, after the interviewer showed the respondent a bottle of defendants' product, the interviewer asked, "[w]hat was the first thing that came to your mind when you looked at this product?" If the respondent mentioned champagne or wine, he would then be asked whether he had a particular brand in mind. Out of 50 respondents, 24 drew an association with DOM PÉRIGNON of some kind. Specifically, when asked the above question, fifteen respondents answered, "Dom Pérignon." These respondents also indicated that they believed that authorization to use defendants' label emanated from DOM PÉRIGNON. The balance of respondents did not mention champagne or wine or otherwise make a first association with DOM PÉRIGNON. However, of these latter 25 respondents, nine indicated in response to later questions that DOM POPINGNON either emanated from or required approval from DOM PÉRIGNON. Thus, 47 percent of respondents believed that an association of some sort existed between the two products. The figure of 47 percent did not include four respondents who made an initial association, but did not believe DOM POPINGNON required an authorization from Schieffelin. Also excluded from the 47 percent figure were an additional two respondents who mentioned DOM PÉRIGNON in a manner suggesting that they were guessing. Silver advised Schieffelin of these results by letter dated March 20, 1989. See Plaintiff's Exhibit 38.

In a letter dated March 22, 1989, some fifteen months after her initial contact with defendants, plaintiff's counsel renewed Schieffelin's demand that defendants discontinue use of the DOM POPINGNON product. The letter reads, in pertinent part:

Although you expressed disagreement with [Schieffelin's position in 1987], we did not thereafter see any significant market activity with the DOM POPINGNON product, and we thought the matter could be closed. Unfortunately it cannot. It has recently come to our attention that your client is apparently increasing sales activity for DOM POPINGNON. It is being sold in gourmet food stores to the same clientele who are most likely also to purchase and consume DOM PÉRIGNON champagne....

In order to verify that our concern about confusion was justified, we commissioned a pilot survey and learned that 47% of the people interviewed felt that your client's product was authorized by the company having rights in DOM PÉRIGNON.

In the circumstances, I have no alternative but to reiterate my client's earlier protest and to insist that the marketing of the DOM POPINGNON product cease. If I do not receive a satisfactory reply from you within ten days, I will have no alternative but to resort to legal action.

See Defendants' Exhibit G. When defendants declined to comply with these demands, Schieffelin filed its complaint on May 1, 1989.

Subsequent to the commencement of the lawsuit, Schieffelin discovered at or about late November 1992 that defendants had, on their own initiative, added a disclaimer to the DOM POPINGNON label: "Not affiliated with Schieffelin & Co. or CUVÉE Dom Pernignon [sic]". By this time, defendants' product was offered for sale in a broader variety of retail stores than had been the case at the time of the pilot survey. Consequently, Schieffelin engaged a second market survey to determine whether the potential for confusion had changed in the intervening period following the pilot survey.

In view of the change in DOM POPINGNON's commercial availability, Silver changed the universe of respondents to reflect the new consumer "profile". Because DOM POPINGNON was now known to be commercially available in a broader range of

commercial outlets, the screener no longer restricted respondents to shoppers at specialty stores. Additionally, the full survey was conducted at sites in six different cities, spread out geographically across the United States. The full survey included responses from persons who were at or above the drinking age, rather than the age of 25, as had been the case in the pilot. Finally, the full survey sought to sample men and women in proportion to their numbers in the population. However, like the pilot survey, the full survey was not statistically projectable to the entire universe.

The full survey was conducted in shopping malls, in a manner similar to the execution of the pilot survey. Interviewers presented the respondents with a bottle of DOM POPINGNON, which included the recently added disclaimer. Following his experience in conducting network surveys, Silver undertook to obtain 200 survey responses, and ultimately obtained 189 responses following the elimination of unusable responses.

The first item tested by the full survey was "top of mind association." *See* Plaintiff's Exhibit 40 at 7. At this stage, four percent immediately mentioned DOM PÉRIGNON, and an additional two percent mentioned the shape of the bottle as being reminiscent of DOM PÉRIGNON. Of those who did not initially mention DOM PÉRIGNON directly, but did mention champagne or wine, 16% mentioned DOM PÉRIGNON in response to a follow-up question that tested whether they had any specific champagne or wine in mind.

After measuring "top of mind association," Silver's questionnaire tested whether the respondents had a view as to who made or marketed defendants' product. It was determined that 10% believed that DOM POPINGNON was made or distributed by DOM PÉRIGNON. *See id.* at 11. An additional 22% said that authorization was required and received from DOM PÉRIGNON in order to market DOM POPINGNON. After Silver "netted out" overlapping figures, he determined that 38% of respondents named DOM PÉRIGNON specifically in reference to defendants' product. Silver concluded that a "very strong connection in the minds of consumers or the general public [exists] between

DOM POPINGNON and DOM PÉRIGNON." Record at 172.

Generally, the survey also revealed that 57% of respondents drew an association between defendants' DOM POPINGNON product and wine, champagne or liquor. Overall, 70% of respondents made an association with DOM PÉRIGNON specifically, or wine and champagne in general.

Also in 1992, a syndicated study of wine drinkers was conducted by the Gallup organization, on behalf of Multi–Sponsor Surveys. The survey was prepared for the use of several corporate clients, including Schieffelin & Somerset. Record at 188. Additionally, the purpose of the survey was to examine the wine market, and was unconnected to litigation. The results were statistically projectable to the universe, which was defined as those persons 21 years of age and older who had consumed wine within one month prior to the date of the survey. At one point in the survey, respondents were tested as to their "unaided awareness"—i.e., without the benefit of prompting—of the names of particular brands and types of wine. Thus, the questioners asked, "Please tell me all the *brands and types* of wine you can think of. [Response] Any others?" The question "any others" was repeated until the respondent ran out of answers. *See* Plaintiff's Exhibit 13 at 82. Significantly, the question was addressed to all types of wine, including champagne. One percent of respondents named, without prompting, DOM PÉRIGNON as a wine or champagne with which they were familiar.

Defendants take the position that the percentage of respondents identifying DOM PÉRIGNON is too low to support a finding that the mark is strong. The court disagrees. First, it is to be recalled that respondents were asked to identify brands of wine on an unaided awareness basis. Second, referring to the results of the survey, it is apparent that a response as low as one percent is hardly indicative of obscurity. A number of other wines, including categories of wine, were identified by only one percent of those questioned. Only three percent of respondents even identified champagne as a wine category. Thus, the degree of identifi-

cation here is entirely consistent with a finding of a high consumer recognition of DOM PÉRIGNON.

Respondents were later asked, "I am going to read you some brands of wine. For each, please tell me if you have heard of that brand. Have you heard of ..." Plaintiff's Exhibit 13 at 86. The highest recognition was of Gallo, at 73% of respondents. The second highest was DOM PÉRIGNON, at 72%. Later in the survey, likewise on an aided awareness basis, 50% of respondents indicated that they had seen advertisements for Gallo; the third highest number was 28%, for DOM PÉRIGNON.

At the close of the trial, Schieffelin waived all claims for money damages, and abandoned any claims against the individual defendant. Hence, the relief requested at this stage is limited to injunctive relief against the corporate defendant and its officers, and for attorney's fees.

## DISCUSSION

### I.

The central issue in an action for federal trademark infringement under section 32 of the Lanham Act is whether the defendant's use of a mark is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The court's inquiry is focused on whether there is a likelihood that an "appreciable number of ordinarily prudent purchasers" will be misled or confused as to the source of the goods at issue. *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 579–80 (2d Cir.1991). To establish a likelihood of confusion, plaintiff need not

prove that consumers would believe that Schieffelin actually produced and marketed defendants' goods; rather "[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979). The court's inquiry into whether consumers are likely to be confused by defendants' mark is equally determinative of Schieffelin's common law action for unfair competition. *See Andy Warhol Enters., Inc. v. Time Inc.,* 700 F.Supp. 760, 763 (S.D.N.Y.1988).[5]

In deciding whether the similarity of the marks in question is likely to cause confusion among consumers as to the source or sponsorship of defendants' product, the court is guided by the nonexclusive eight-factor test established by Judge Friendly in his landmark decision in *Polaroid Corp. v. Polaroid Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This court indicates its conclusions as to each of the *Polaroid* factors *seriatim:*

### 1. Strength of Schieffelin's Trademarks.

As a threshold matter, the court refers to Judge Leisure's observation that Schieffelin's marks are inherently distinctive. Consequently, Schieffelin need not prove that the marks have acquired secondary meaning. Inherently distinctive marks are to be afforded the highest level of protection.[6] It is further to be recognized that Schieffelin's federal trademarks are registered and incontestable, thereby entitling them to a liberal

---

5. Defendants contest Schieffelin's ownership of the common law trademark rights to "Dom Perignon". The court accepts the contrary testimony of Beran that Moet and Schieffelin intended that their transfer of federal trademark rights be coextensive with the common law rights. *See* Plaintiff's Exhibits 43, 44; Record at 209–211. Moreover, it is axiomatic that trademarks are legally inseparable from the goodwill which they represent. *See* J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, § 18.1, B. at 793 (1984 & 1991 Supp.). Once the goodwill associated with the common law "Dom Perignon" mark resided with Schieffelin in the minds of consumers (Testimony of Pellaton, Record at 52–4), Schieffelin's legally protectable interest in the mark followed.

*See e.g., Premier Dental Products v. Darby Dental Supply Co.,* 794 F.2d 850, 854–55 (3rd Cir.1986).

6. In *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976), Judge Friendly described four classes of trademark, "[a]rrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded ... (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." The latter two classes are regarded as inherently distinctive marks, and are entitled to trademark protection without proof of secondary meaning. J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, § 11:2 (2d ed. 1984).

application of the law. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986).

Nevertheless, the classification of the mark as "inherently distinctive" does not end the court's inquiry. A mark may be conceptually strong and at the same time be commercially weak if the mark lacks significance in the market place for purposes of identifying the origin of the goods. *See Playboy Enters., Inc. v. Chuckleberry Publishing Co.*, 486 F.Supp. 414, 420 (S.D.N.Y. 1980), *aff'd*, 687 F.2d 563 (2d Cir.1982). Thus, the court must measure the strength of the mark as a function of its " 'origin-indicating' quality in the eyes of the purchasing public." *See McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979). Put another way, where the marks are inherently distinctive, a plaintiff will prevail on the "strength of the mark" component of the *Polaroid* test as long as the alleged infringer does not adduce evidence tending to show that the distinctive mark is nevertheless a weak one. *See id.* at 1132. Accordingly, evidence that is probative of the mark's recognition among the relevant class of purchasers will "enhance the strength of [the] mark and thus enlarge the scope of protection to which it is entitled." *Id.*

Such evidence is particularly appropriate in the case at bar, in view of the 1964 decision by the Second Circuit in *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531 (2d Cir.1964). In *Chandon Champagne*, the court held that, as of 1939, the DOM PÉRIGNON mark was weak, because only a few hundred cases of DOM PÉRIGNON had been sold in the United States at that time. Schieffelin bore the burden at trial, therefore, of proving that its trademarks had acquired strength in the intervening period. Having considered the evidence, the court is of the opinion that Schieffelin successfully carried that burden.

The record contains abundant evidence from which to conclude that the "CUVÉE DOM PÉRIGNON" mark—or, at least, the "DOM PÉRIGNON" portion thereof—has acquired fame and widespread consumer recognition. The Multi–Sponsor Survey in particular established, on both an aided and unaided awareness basis, that DOM PÉRIGNON is well known among the purchasing public.

Additionally, the evidence established that DOM PÉRIGNON is widely available in restaurants, liquor stores, and in grocery stores where permitted by state law. According to Pellaton's testimony, DOM PÉRIGNON is sold by Schieffelin to 167 distributors covering all 50 states. Record at 16. In this respect, the marketing of DOM PÉRIGNON differs drastically from the situation existing prior to the Second World War, when sales did not exceed a few hundred cases in the United States. *See Chandon Champagne*, 335 F.2d at 534. Although DOM PÉRIGNON remains relatively scarce, the demand for the product is quite high, permitting Schieffelin to command a retail price of approximately $80 per bottle. Record at 21. It follows that the public is well aware of DOM PÉRIGNON and is willing to pay handsomely for it.

Moreover, the discussion of DOM PÉRIGNON in articles and books on the subject of wine is highly probative of the success and wide recognition of the mark in the champagne market. Similarly, the broad dissemination of the DOM PÉRIGNON mark in retail catalogs and other advertisements in the print media further supports Schieffelin's case that the mark has grown in strength. It should further be observed that the identity of the mark with fame and wealth, as demonstrated by the selective promotion of DOM PÉRIGNON in such contexts as the James Bond pictures, reflects a painstaking and fruitful effort on the part of the trademark owner to cultivate not merely strength but a distinct character as well. Schieffelin's consistent effort to prevent use of its marks in a manner that would either confuse consumers or undermine the goodwill associated with its brands is, therefore, further proof of the strength of plaintiff's marks. *See Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F.Supp. 96, 124 (S.D.N.Y.1989) (citing *E.I. DuPont de Nemours & Co. v. Yoshida Int'l., Inc.*, 393 F.Supp. 502, 512 (E.D.N.Y.1975)).

The shield label, although not as strong as the "CUVÉE DOM PÉRIGNON" mark, is likewise entitled to protection. While Schieffelin did not have evidence equivalent to the Gallup survey (which proved the strength of the phrase "(CUVÉE) DOM PÉRIGNON") to prove the strength of the shield label, several witnesses testified that they personally identified DOM PÉRIGNON by the shield label. Further, plaintiff offered evidence to show that, of twenty renowned vintages of French champagne imported into the United States, only DOM PÉRIGNON uses a shield design label. And, although defendants produced evidence that several other manufacturers of sparkling white wine sold products under their own shield design labels, *see* Defendants' Exhibits N through R, all are readily distinguishable on sight from DOM PÉRIGNON. Moreover, fatal to this line of argumentation was defendants' failure to adduce evidence that such third party trademarks in any way diminished the strength of *Schieffelin's* mark. *See Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),* 544 F.2d 1167, 1173–74 (2d Cir.1976).[7] Nor did defendants adduce any other proof to contradict the testimony of Schieffelin's witnesses. The court is, therefore, satisfied that the shield design label is strong in its own right and is associated by purchasers specifically with DOM PÉRIGNON champagne.

In sum, the court finds that the DOM PÉRIGNON mark, as well as the shield label, are strong marks. This factor, thus, favors Schieffelin.

### 2. Similarity of the Marks.

"The test for determining similarity is whether the respective marks convey the 'same general overall impression' to the purchasing public when viewed separately. Ultimately, the crucial question is whether the similarity is likely to cause confusion." *Western Publishing Co., Inc. v. Rose Art Industries, Inc.,* 910 F.2d 57, 61 (2d Cir. 1990). Here, examination of Schieffelin's champagne and defendants' popcorn product immediately establishes beyond peradventure of a doubt that the marks are strikingly

similar, thereby tending to show that consumers are more likely than not to be confused as to the source or sponsorship of DOM POPINGNON. Schieffelin correctly points out that the term "CUVÉE DOM PÉRIGNON" and "DOM POPINGNON" are extremely similar on both an auditory and visual level. Concerning the shield design label, as the court observed in detail *supra,* and as an inspection of the Appendix quickly demonstrates, the DOM POPINGNON label deliberately parallels the DOM PÉRIGNON shield design in color, shape, and in the content of the label on an item-by-item basis. Although it is true that the DOM POPINGNON label is slightly larger than that of DOM PÉRIGNON, and contains certain variations in terms of the location of corresponding items, the court finds that such differences do not meaningfully detract from what is otherwise an extremely high degree of similarity. Moreover, such differences as can be discerned on careful inspection are insufficient to dispel the legal significance of the similarity of these marks. As the Second Circuit explained in *RJR Foods, Inc. v. White Rock Corp.,* "[t]he test of customer confusion is not whether the products can be differentiated when subjected to a side-by-side comparison, but rather whether they create the same general overall impression." 603 F.2d 1058, 1060 (2d Cir.1979). The court determines that the marks are sufficiently similar to cause significant customer confusion, and this factor accordingly weighs heavily in favor of Schieffelin.

### 3. Similarity Between the Products.

Schieffelin urges that, although champagne and popcorn are different products, they are "related in use," and "expensive in their respective categories." Plaintiff's Post Trial Brief at 28. This link between champagne and food, which Schieffelin suggests has been reinforced by defendants' label, is entirely too tenuous a connection to permit Schieffelin to prevail on this factor. To begin with, Schieffelin has not adduced evidence showing that the two products are sold at one common retail establishment. Nor does the rec-

7. The exhibits of American champagnes, packaged in foil and using shield-shape labels are relevant, however, to Schieffelin's trade dress claim, discussed more fully, *infra.*

ord establish that the goods "serve the same purposes, fall within the same general class, or are used together...." *Lang, supra,* 949 F.2d at 582. Although the category of popcorn is closer to champagne than, for example, ball bearings, the record does not contain evidence that the purchasing public uses popcorn and champagne in conjunction, or generally serves them together. (Certainly, the court is unaware of any James Bond picture in which 007 munched Orville Redenbacher's popcorn while quaffing DP '53!) Quite simply, these products do not compete with one another. It is, therefore, difficult to see how this factor of the test supports a case for confusion. Accordingly, this factor does not favor Schieffelin.

### 4. *Bridging the Gap.*

The object of the fourth *Polaroid* factor is to test whether Schieffelin is likely to enter the popcorn market. *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1227 (2d Cir.1987); *McGregor–Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1135–36 (2d Cir.1979). Inasmuch as Schieffelin concedes that it has no intention of expanding into the popcorn business under the DOM PÉRIGNON marks, this factor favors defendants.

### 5. *Actual Confusion.*

It is fundamental that, in a claim for injunctive relief under the Lanham Act, "actual confusion need not be shown ... since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, supra,* 799 F.2d at 875. Nevertheless, evidence of actual confusion is highly probative of the likelihood of confusion. *See Grotrian, Helfferich, Schulz Th. Steinweg Nachf. v. Steinway & Sons,* 365 F.Supp. 707, 715–16 (S.D.N.Y.1973), *modified,* 523 F.2d 1331 (2d Cir.1975) ("[a]lthough evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion.") Such proof may take the form of direct evidence, such as testimonial, anecdotal evidence by actual consumers, or as in the case at bar, the more

usual form of market research surveys. *See Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 140 (2d Cir.1991).

### A. *Reliability of the Survey Evidence.*

At this juncture, the court resolves evidentiary issues concerning the admissibility of the two market surveys prepared by Target on behalf of Schieffelin. Defendants repeatedly objected to the admissibility of those surveys, on the ground that they are nonprobability surveys, i.e., not statistically projectable to the entire universe of customers. The court overruled those objections and admitted the survey results into evidence. Defendants then attacked the foundation of the surveys during cross-examination of Schieffelin's expert witness, and now assert that the evidence is not trustworthy. The court disagrees.

This Circuit considers survey evidence to be admissible on the issue of consumer confusion, subject to the condition that "[t]he survey must ... have been fairly prepared and its results directed to the relevant issues." *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir.1984). The principles governing the relevance and proper weight of survey evidence were articulated in *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.:*

> The trustworthiness of surveys depends upon foundation evidence that (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, concise and nonleading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.

559 F.Supp. 1189, 1205 (E.D.N.Y.1983). *See also, Hutchinson v. Essence Communications, Inc.,* 769 F.Supp. 541, 557 (S.D.N.Y. 1991); *Weight Watchers Intern. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272 (S.D.N.Y.1990).

Defendants argue that the Target surveys suffered from flaws under criteria (1), (2), (6) and (7) of the *Toys "R" Us* test.

[15] The court agrees with defendants that the "universe" defined by Silver was, in fact, somewhat overbroad. Nevertheless, for the reasons that follow, the court rejects defendants remaining contentions and finds that an adequate foundation was established to support the admission of Schieffelin's survey.

"The universe is that segment of the population whose characteristics are relevant to the mental associations at issue." J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, § 32.47 (1984 & 1991 Supp.). Here, Silver defined his universe as persons between the legal drinking age and the age of 64, although in the pilot survey he established a minimum age of 25. The court perceives that such a definition is somewhat overbroad in that it encompasses all persons who might legally purchase DOM PÉRIGNON, save for those older respondents whose auditory or visual faculties might have interfered with the conduct of the survey. As the Second Circuit explained in *Universal City Studios,* " [t]o be probative and meaningful ... surveys ... must rely upon responses by *potential customers* of the products in question.'" 746 F.2d at 118 (emphasis added) (quoting *Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y.1981)). *See also, Weight Watchers Intern., Inc. v. Stouffer Corp., supra,* 744 F.Supp. at 1272–73 (where competing products were diet entrees, universe defined as women between 18 and 55 who tried to lose weight through diet and/or exercise was too broad and should have been limited to purchasers of diet entrees trying to lose weight by dieting). The court can hardly believe that the mere fact that interviewees had reached the drinking age rendered them the equivalent of potential customers for DOM PÉRIGNON. Rather, the better definition of the universe in this case would have been that group of consumers who were in the market for DOM PÉRIGNON, or at least for champagne.

In an attempt to deflect objections to the definition of the universe, Silver suggested during cross-examination that restricting his sample to people in the market for DOM PÉRIGNON would necessarily result in an even higher rate of connection between DOM PÉRIGNON and defendants' product than the instant survey revealed. *See* Record at 301, 330–31. The court declines to take Silver's statement at face value, particularly because he failed to articulate the scientific basis upon which to ground that opinion. True, it is certainly plausible that a higher number of dedicated DOM PÉRIGNON purchasers might initially say that the first thing they thought of upon viewing the DOM POPINGNON bottle was, indeed, DOM PÉRIGNON. However, the court can only speculate as to whether those same respondents would also believe in correspondingly greater numbers that DOM PÉRIGNON either sponsored or authorized DOM POPINGNON.

Despite the aforementioned shortcomings, the court does not reject the results entirely. In view of the widespread recognition of DOM PÉRIGNON among the public at large, responses concerning the source or sponsorship of defendants' product from even as broad a universe as the one Silver constructed are more likely than not to shed some light on how potential purchasers of DOM PÉRIGNON would react when presented with defendants' CHAMPOP product, and are probative of confusion. Ninety percent of the respondents indicated that they had heard of DOM PÉRIGNON, and 38% reported that they had drunk DOM PÉRIGNON at some time. *See* Plaintiff's Exhibit 40 at 22, Questions 11a & b. Additionally, in view of the fact that a mere 12 out of 189 interviewees in the full survey had purchased DOM PÉRIGNON, it follows that Target would have been required to interview thousands of respondents before arriving at a pool of 200 potential purchasers. Consequently, the court finds that such imperfections as can be discerned in the definition and sampling of the universe are not fatal, but are factored into the weight that should be given to the evidence. *See Universal City Studios, supra,* 746 F.2d at 118.

Defendants further attack the size of the sample. Although Silver testified that televi-

sion networks typically require a sample size of 200 respondents, Target was forced to pare the sample size down to 176 following post-survey verification of responses. Silver added, however, that companies other than networks routinely base decisions on even smaller samples. Record at 174. While Silver admitted that results from a sample of 176 would have a higher error rate than results from a sample of 200, he indicated that the difference would be minuscule. Record at 293. In view of the large percentage of people indicating confusion as to the source of defendants' product, the court is satisfied that the results from both the pilot and the full surveys are not compromised by the reduction of the sample.

The court has considered defendants other objections concerning the foundation of the survey, and determines that they are without merit. Defendants' objection to the question, "Do you think the company that makes or distributes the product I showed you had to get authorization—that is permission—from anyone else to market the product?" as a "legal" question is ineffective. The question sought to reveal whether, upon viewing the CHAMPOP bottle, an ordinary purchaser would believe that the owner of the DOM PÉRIGNON trademarks sponsored or approved their use on defendants' product— certainly a relevant inquiry under this Circuit's caselaw. *See Dallas Cowboys, supra,* 604 F.2d at 204–05. As to defendants' final objection, the court is satisfied that the survey was conducted objectively, and that every effort was made to ensure that the results were not tainted by knowledge of the client, the litigation or background "noise."

### B. *Statistical Projectability.*

The court observes that the issue of whether market research surveys must be statistically projectable to an entire universe has already been litigated and resolved in several courts. *See National League Properties, Inc. v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 518 (D.N.J.1986) (citations omitted). The touchstone, of course, is relevance. If the survey makes "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evi-

dence", it is properly admissible at trial. Fed.R.Evid. 401. *See also McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988).

### C. *The Existence of Actual Confusion.*

As the court has already discussed, the Target pilot survey results indicate actual confusion as to the source or sponsorship of defendants' product. Upon viewing a bottle of DOM POPINGNON, fifteen out of 50 respondents made an association to DOM PÉRIGNON *and* believed that it authorized CHAMPOP. Nine additional responses suggested that authorization was required from DOM PÉRIGNON, yielding a total of 47% that believed that CHAMPOP emanated in some way from DOM PÉRIGNON. The results of the second Silver survey reflected that 38% of respondents made some mental association between DOM PÉRIGNON and defendants' product. Ten percent believed that DOM PÉRIGNON was the source or distributor of DOM POPINGNON, and an additional 22% opined that DOM POPINGNON required authorization from DOM PÉRIGNON.

The court considers that the results of the Target surveys demonstrate actual confusion in a controlled environment, of a magnitude sufficiently strong to suggest a likelihood of confusion among consumers. Accordingly, this factor favors Schieffelin.

### 6. *Defendants' Good Faith In Adopting Their Own Mark.*

Calderaio readily admitted at trial that he derived his own "DOM POPINGNON" mark and the shield label from DOM PÉRIGNON. Thus, copying is not an issue in this case. Schieffelin urges that confusion should be *presumed* from the fact of intentional copying of its marks. *See My–T Fine Corp. v. Samuels,* 69 F.2d 76, 77 (2d Cir.1934) (L. Hand, J.) Defendants counter that intentional copying does not weigh in favor of Schieffelin under the *Polaroid* analysis because DOM POPINGNON is, and was intended from the beginning to be, a parody of DOM PÉRIGNON. Although resolution of the issue of parody implicates other factors in the *Polaroid* test, most particularly the

similarity of the marks and the existence of actual confusion, the court will address those issues here.

As a threshold matter, the court observes that defendants' product is plainly a humorous takeoff on DOM PÉRIGNON. The very name "DOM POPINGNON" is obviously a pun, and close examination of defendants' label reveals an imitative, comic scheme not unlike that of other parody cases. Nor are defendants automatically liable for infringement merely because they made a close approximation of Schieffelin's label; to parody a mark, it is necessary to copy at least enough of the original to call it to the mind of people viewing the parody. McCarthy, *supra,* § 31.38 at 670. The fact that defendants' product is a joke, however, does not end the court's inquiry. The junior user or parodist of another's mark may not invoke parody as a talisman to defeat liability under the Lanham Act; nor is parody a defense to infringement. As Judge Leisure explained in his denial of defendants' motion to dismiss, the proper inquiry is whether the parody is strong enough to cast doubt on the overall likelihood of consumer confusion. *See Schieffelin,* 725 F.Supp. at 1323 (quoting McCarthy, *supra,* § 31:38 at 667).

The Second Circuit explained in *Cliffs Notes v. Bantam Doubleday Dell Pub. Group, Inc.,* 886 F.2d 490 (2d Cir.1989), that a parody will escape liability under the Lanham Act as long as the joke does not serve to identify the owner of the lampooned trademark as the source, sponsor or origin of the parodist's product:

> A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused. (emphasis in original).

*Id.* at 494.

The court is of the opinion that the issue of whether defendants' product conveys the simultaneous and contradictory message described in *Cliffs Notes* is actually a closer question than Schieffelin would suggest.

The play on the word "Pérignon", coupled with the whimsical substitution of corncobs for grapes and Iowa for France, etc., does suggest that Calderaio sincerely intended his product to be a caricature of DOM PÉRIGNON, and that he did not intend purely to trade on the goodwill that Schieffelin built up in its champagne. Certainly, it is unremarkable that Calderaio selected as the target of parody a readily recognizable product; indeed, one would hardly make a spoof of an obscure or unknown product! But that Calderaio intended consumers to see Schieffelin's trademark in his parody is not to say that his object was to profit from confusion or from injury to Schieffelin. In that respect, therefore, the good faith factor of *Polaroid* does not weigh against defendants.

Nevertheless, after careful consideration of the applicable precedents, the court holds that defendants' product is not a sufficiently strong parody to overcome the likelihood of confusion, notwithstanding defendants' subjective good faith. A contrast of the instant case with several precedents in which parody was successfully maintained compels this conclusion.

In *Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. 785 (E.D.N.Y.1983), the court denied a preliminary injunction against the sale of children's stickers found to be a humorous adaptation of Tetley tea bags. Significantly, the court found that Topp's "Wacky Packages" sticker was at once similar and obviously dissimilar to Tetley's labels, thereby undermining a likelihood of confusion:

> While defendant has satirically adapted plaintiff's packaging colors and design and has substituted "Petley" for the "Tetley" mark printed on plaintiff's package, "Orange Pekingese Fleas" for the "Orange Pekoe and Pekoe Cut Black Tea" label printed on plaintiff's package, ... and "Tiny Little Dog Fleas" for the "The Tiny Little Tea Leaf Tea" mark printed on plaintiff's package, such broad satirical adaptation draws a heavy line between itself and the object of satire.

*Id.* at 790. The court went on to observe, *inter alia,* that Tetley had failed to adduce

proof of actual confusion. *See id.* at 791. Thus, the *Tetley* court was satisfied that it would be immediately clear upon inspection of the defendant's sticker that Tetley was not the source or sponsor of that product. *Cf. Gucci Shops, Inc. v. R.H. Macy & Co., Inc.,* 446 F.Supp. 838, 840 (S.D.N.Y.1977) (since "GUCCHI GOO" mark could conceivably mislead consumers at a glance into believing that GUCCI was somehow associated with promotion of defendant's diaper bag, joke did not eliminate likelihood of confusion).

Similarly, in *Universal City Studios,* the Second Circuit affirmed a grant of summary judgment against the owners of trademarks in the name and story of "King Kong." Universal complained that Nintendo's popular video game, "Donkey Kong", infringed upon its trademarks in "King Kong."[8] The court in *Universal City Studios* concurred with the findings of the district court, *viz.,* that a clear contrast was to be made between the "'farcical, childlike and nonsexual'" Donkey Kong on the one hand, and the ... "'ferocious gorilla in quest of a beautiful woman'" on the other. *Id.* at 116 (quoting *Universal City Studios v. Nintendo Co., Ltd.,* 578 F.Supp. 911 (S.D.N.Y.1983) (Sweet, J.)). The Second Circuit agreed that "the fact that Donkey Kong so obviously parodies the King Kong theme strongly contributes to dispelling confusion on the part of consumers." *Id.*

More recently, in a well reasoned decision by Judge Leval, the court in *Yankee Publish-ing Inc. v. News America Pub. Inc.,* 809 F.Supp. 267, 273 (S.D.N.Y.1992), held that a mimic of the cover design of the *Old Farmer's Almanac* in the 1990 Christmas issue of *New York* magazine was not an infringement of the plaintiff's trademark, because it was clear from a quick inspection of *New York's* cover that its design *referred to but was not in fact* that of the *Almanac.*[9] Examination of the facts in *Yankee Publishing* reveals several similarities to the case at bar, as well as several key distinctions which are devastating to defendants' parody argument.

In *Yankee Publishing,* the court found that *New York* had imitated the general design of the *Almanac.* However, as the court emphasized, the dissimilarities quickly dispelled any notion that *Almanac* was the source of the *New York* design:

> In place of the [*Almanac's* ] familiar rustic scenes of farm life, with the portrait of thrifty Ben Franklin, there appear gaudily wrapped Christmas presents, an elegantly uniformed waiter serving dinner to a dog, and framed miniatures of Mr. and Mrs. Saint Nicholas. What the joke is designed to evoke is how different *New York* is from the *Old Farmer's Almanac,* and not the similarities between them.

> The sizes of the publications are also different: The *Almanac* is a small 5½ × 8″ booklet, with a hole punched through its upper left hand corner. *New York* is a larger format, 8″ × 10¾″. The two books

---

**8.** "Donkey Kong requires the player to maneuver a computerized man named Mario up a set of girders, ladders and elevators to save a blond pigtailed woman from the clutches of a malevolent, yet humorous gorilla, while simultaneously avoiding a series of objects such as barrels and fireballs hurled at him by the impish ape." 746 F.2d at 114.

**9.** It should be noted that the court did not hold that *New York's* imitation was a parody *per se;* rather it was a form of expression that deserved protection as communicative expression. Although the court made it clear that its holding rested upon a finding that there was no likelihood of confusion, based upon a thorough analysis under *Polaroid,* it proceeded to state in *dicta* that even if some likelihood of confusion existed, the first amendment provided protection for the unauthorized use of plaintiff Yankee Publishing's trademark as part of the expression of a communicative message. *See id.* at 275–82 (citing, *inter alia, Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) (balancing rights of title owner against free speech interests of alleged infringers)). Although defendants have not framed their argument in these terms, the court considers that defendants' marks are so similar to those of Schieffelin, and hence, likely to confuse consumers, that in this case, unlike in *Yankee Publishing,* it is the trademark owner's interests and not the countervailing speech rights of defendants that are paramount. The court also notes the recent Supreme Court decision in *Luther Campbell v. Acuff–Rose Music, Inc.,* —— U.S. ——, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), recognizing parody as a fair use under the Copyright Act of 1976, 17 U.S.C. § 107. The *Acuff–Rose* decision does not impact the court's decision here, inasmuch as the interests protected under the Lanham Act are not identical to those of the copyright holder. *See also, Dallas Cowboys Cheerleaders, supra,* 604 F.2d at 205–06 & n. 9 (court skeptical of "fair use" defense in trademark law).

make a distinctively different appearance. Even if the first glance at the cover were to cause momentary confusion, a further look into the magazine would dispel it. The title page, the masthead, and the familiar layout are easily recognizable as *New York,* and as very different from the *Old Farmer's Almanac.*

*Id.* at 273.

Here, as in *Yankee Publishing,* defendants' imitation mimics the familiar elements of DOM PÉRIGNON, substituting certain elements for those of the plaintiff's mark in order to achieve a comic effect. Nonetheless, defendants here failed to design a label that adequately communicated to the viewer that it was something *other than* the shield design of DOM PÉRIGNON. Unlike the size of the magazine covers in *Yankee Publishing,* the two labels in the instant case are not so different in size as to dispel the likelihood of confusion. Nor is there any dramatic analogue to the *New York* masthead in defendants' label to make it quickly apparent that Schieffelin had nothing to do with CHAMPOP.

The short of the matter is that defendants' parody is not sufficiently effective to eliminate a likelihood of confusion on the part of customers. The appearance of defendants' label does not draw a clear enough line between defendants' marks and those of Schieffelin to alert consumers that DOM PÉRIGNON is not the source or sponsor of DOM POPINGNON. This conclusion is compelled in large measure by the evidence of actual confusion discussed *supra.*

### 7. *Quality of Defendants' Product.*

It is stipulated that Schieffelin has no control over the quality of defendants' product. Although Schieffelin admits that it is unaware of any current problems associated with the quality of DOM POPINGNON popcorn, it suggests that the quality of defendants' popcorn could deteriorate in the future, adversely impacting upon the reputation of DOM PÉRIGNON. *See Processed Plastic Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982). Finally, Schieffelin argues that popcorn is inherently inferior to its champagne.

The court is skeptical of Schieffelin's position in this regard. Common sense would indicate that any damage caused to the reputation of Schieffelin's champagne by the comparative quality of defendants product is likely to be negligible inasmuch as popcorn is not a competing substitute for champagne, at least among oenophiles. Moreover, Schieffelin did not introduce evidence to show that such a diminution was actually possible. Quite the contrary, the record shows that defendants filled their bottles with the same kernels used by other manufacturers, such as Orville Redenbacher. Schieffelin did not prove that defendants are currently using "premium" kernels, for which lower grade kernels might later be substituted, or that kernels are even graduated according to quality. Rather, the high price of defendants' bottle of popcorn actually reflects the packaging and the concept: defendants were selling their idea more than their popcorn. This factor, therefore, is neutral.

### 8. *Sophistication of the Purchasers.*

This factor does not assist Schieffelin. Even if some of the prospective purchasers of DOM PÉRIGNON are from low income groups, and are therefore less sophisticated shoppers than wealthier purchasers, there is no evidence in the record that shoppers of *any* background will "impulse buy" a bottle of popcorn priced between $8.99 and $15.99. Indeed, the very notion is counterintuitive. To the extent that a shopper might make such a purchase, it would likely be after viewing the bottle carefully, grasping the joke, and seeking to share it with others. This case is not one where unsophisticated customers may fall prey to similar marks of inexpensive products that are in competitive proximity with each other. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 78 (2d Cir.1988) (cited in *Girl Scouts v. Bantam Doubleday Dell Pub.,* 808 F.Supp. 1112, 1129–30 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1477 (2d Cir.1993) (emphasis added)). Rather, it is stipulated that both products are expensive in their respective markets. Thus, this factor weighs in favor of defendants.

\* \* \* \* \* \*

Considering all of the above factors under the *Polaroid* test, the court concludes that Schieffelin has carried its evidentiary burden of showing a likelihood of confusion on the part of consumers as to the source or sponsorship of DOM POPINGNON. The court bases its conclusion in particular upon the close similarity of the marks and Schieffelin's proof that actual confusion does exist among consumers. Schieffelin accordingly prevails on its claim for federal trademark and common law trademark infringement.

## II.

▮ The court takes a different view, however, with regard to Schieffelin's claim for trade dress infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Schieffelin failed to establish evidence that the shape and overall appearance of the DOM PÉRIGNON bottle had acquired secondary meaning. Although Schieffelin successfully established recognition of the DOM PÉRIGNON component of the phrase "CUVÉE DOM PÉRIGNON", it has not established that consumers associate the shape of its bottle and the rest of its packaging with DOM PÉRIGNON and Schieffelin. Indeed, the shape of DOM PÉRIGNON's bottle has long been common among French champagnes. Moreover, defendants produced several bottles, including American sparkling white wines, which shared in common with DOM PÉRIGNON not only the shape of the champagne bottle, but a metal foil wrap at the top of the bottle and a shield-design label. Although such exhibits do not undermine the strength of DOM PÉRIGNON's marks, they do permit an inference that the packaging of sparkling white wines is generally the same. Defendants aptly state that Schieffelin does not own the champagne "look". Thus, as to this count of the complaint, the court finds in favor of defendants.

## III.

▮ Schieffelin's final claim arises under New York General Business Law § 368–d, which states:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

To prove dilution, Schieffelin would have to establish two elements: (1) an extremely strong mark—either because of the mark's distinctive quality or because it has acquired secondary meaning—and (2) a likelihood of dilution. *Mead Data Central v. Toyota Motor Sales,* 875 F.2d 1026, 1030 (2d Cir.1989).

As to the first requirement, the court has already determined that Schieffelin does, indeed, "possess a strong mark—one which has a distinctive quality [and] has acquired a secondary meaning which is capable of dilution." *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1166 (1977). But Schieffelin's claim fails as to the second requirement, *viz.,* proof of likelihood of dilution.

The Second Circuit has defined dilution as "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Id.* at 1031 (citing *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983) (quoting 3 R. Callman, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 84.2 at 954–55)). "Blurring" has been further defined as the "whittling away of an established trademark's selling power and value through its unauthorized use by others upon dissimilar products." *Id.* Although defendants' marks bear a close similarity to Schieffelin's marks, Schieffelin cannot identify evidence in the record to establish that the selling power of its marks has been thereby diminished. Nor has Schieffelin demonstrated through competent evidence that the DOM POPINGNON mark has tarnished DOM PÉRIGNON. The court declines Schieffelin's invitation to speculate on this matter, and finds for defendants on plaintiff's dilution claim.

### IV.

■ The court now considers defendants' assertion of the affirmative defense of estoppel. Specifically, defendants take the position that they relied detrimentally upon Schieffelin's silence for a period of fifteen months following defendants' initial refusal to comply with the demands set forth in Schieffelin's letter of December 22, 1987. Defendants point to their investment in several thousand bottles of the DOM POPINGNON product, which Calderaio testified would not have been made but for Schieffelin's implied acquiescence to defendants' position that their popcorn product was a parody of DOM PÉRIGNON as expressed in Barron's letter of December 29, 1987. *See* Defendant's Exhibit G. Defendants call to the court's attention the following language from *Polaroid:*

> [I]t cannot be equitable for a well informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of a court decree, much that the competitor has striven for and accomplished—especially in a case where the most that can be said is that the trademark infringement is a genuinely debatable question.

287 F.2d at 498 (quoting *Valvoline Oil Co. v. Havoline Oil Co.*, 211 F. 189 (S.D.N.Y.1913)).

The court is cognizant of the inequity that would result when a trademark owner, although aware of an infringing use of his trademark, sleeps on his rights, only seeking to shut his competitor's business down once it has developed goodwill in the market. On the other hand, the mere fact of a delay does not translate into an estoppel. As the court explained in *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 881 (E.D.N.Y. 1978), the trademark owner is not obliged to sue at the first sign of a *de minimis* infringing use; rather, the time from which estoppel or laches should be measured is the day when "the likelihood of confusion looms large." The court additionally ruled, "one cannot be guilty of laches until his right ripens into one entitled to protection, for only

then can his torpor be deemed inexcusable." *Id.* See also *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 930 (S.D.N.Y.1981). In point of fact, were Schieffelin required to rush into a lawsuit during the earliest months of defendants' infringing sales, when the distribution of DOM POPINGNON was slight, it would have faced the possibility of losing its suit due to the absence of evidence of actual confusion. It was not until the volume of defendants' sales started to grow, and Schieffelin could accurately measure the potential for confusion through scientifically valid methods, that Schieffelin was truly faced with the choice of either taking legal action or watching its rights evaporate. "A reasonable businessman should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir.1985), *cert. denied*, 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 719 (1986). Under the circumstances, the court is of the opinion that Schieffelin was reasonably justified in waiting until a genuine harm could be perceived before commencing legal action.

■ Moreover, the mere delay of a trademark owner in bringing suit is insufficient on its own to give rise to an estoppel or to laches. Rather, as an additional prerequisite to sustaining the claim of estoppel, an alleged infringer also bears the burden of showing that he was prejudiced by the plaintiff's inaction. Here, defendants urge that they reasonably and detrimentally relied upon the lack of response on the part of Schieffelin to Barron's letter of December 29, 1987, and point to the debt incurred in the buildup of inventory during the period between the first and second cease and desist letters. The court disagrees.

■ Initially, it was established at trial that defendants have sold at a modest profit all bottles of DOM POPINGNON that they had purchased and placed in their inventory prior to the filing of this action.[10] Record at

10. This figure excludes 2,000 bottles of finished product, plus 2,000 empty bottles purchased by defendants subsequent to the filing of the lawsuit. Record at 417.

396. Thus, to the extent that defendants did rely detrimentally upon Schieffelin's silence, they have recovered their investment and can suffer no further detriment. Moreover, Schieffelin correctly points out that expenditures incurred in promoting the infringing articles are not the sort of prejudice that would sustain a defense of estoppel and thereby justify denial of injunctive relief. *See Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir.1965) ("[i]f this prejudice could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay".) *See also Weight Watchers, supra*, 744 F.Supp. at 1287. Finally, in light of the relatively low volume of sales over the five year period leading up to trial, the record does not show that defendants have developed any meaningful degree of goodwill in their product. Consequently, defendants cannot prevail on their defense of estoppel.

## V.

Finally, the court addresses Schieffelin's application for attorney's fees pursuant to section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a). Section 35(a) provides, in relevant part, that "[t]he court in *exceptional* cases *may* award reasonable attorney fees to the prevailing party." Initially, therefore, the plain language of the statute establishes that an award of fees under section 35(a) is not mandatory, but resides within the discretion of the court.[11] Additionally, fees are recoverable under this section only in cases where the act complained of is "exceptional," which has been held to encompass malicious, fraudulent, deliberate or willful acts of infringement. *See Vuitton et Fils, S.A. v. Crown Handbags*, 492 F.Supp. 1071, 1078–79 (S.D.N.Y.1979) (quoting Sen.Rep.

No. 93–1400, 93rd Cong., 2d Sess. (1974), *reprinted in* (1974) U.S.C.C.A.N. pp 7132, 7133, 7135), *aff'd without opinion*, 622 F.2d 577 (2d Cir.1980). This is not such a case. Although it is true that defendants intentionally imitated Schieffelin's marks, the court is persuaded that the object of the enterprise was to market a legitimate parody, and not merely to take a free ride on the strength of the goodwill in Schieffelin's marks. In essence, although Calderaio is not a successful parodist, neither is he a counterfeiter, and he is not among the variety of defendants whom section 35(a) was intended to reach. Accordingly, Schieffelin's application is hereby denied.

## CONCLUSION

The court finds in favor of Schieffelin on its claims of federal trademark infringement and common law unfair competition. Defendant The Jack Company, its officers, agents, servants, employees and all those acting in concert or participation with it, are hereby permanently enjoined from selling popcorn (1) under the trademark DOM POPINGNON or any other trademark confusingly similar to the DOM PÉRIGNON trademark, and (2) under defendants' present Shield Label or any other Shield Label confusingly similar to the federally registered Shield Label Design of Schieffelin, and from otherwise so labelling and promoting its product as to create a likelihood of confusion as its source, sponsorship, or affiliation with Schieffelin or DOM PÉRIGNON champagne.

It is ORDERED that Schieffelin's remaining causes of action be, and they hereby are, DISMISSED. Schieffelin's application for attorney's fees is DENIED.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

11. Even if this case were an "exceptional" one, there are sound reasons in the instant case to deny Schieffelin's application. The infringement here was limited in nature, amounting to little more than 20,000 bottles, at a paltry gain to defendants. Furthermore, defendant Calderaio is an unsophisticated individual, operating virtually out of his garage. An injunction against further sales alone will likely close his business. Requiring him also to pay Schieffelin's attorneys would obviously impose a staggering burden upon him and his family. Under all the facts and circumstances, the court would exercise its discretion to deny the application. *Cf. Fendi S.A.S. Di Paola v. Cosmetic World, Ltd.*, 642 F.Supp. 1143, 1147 (S.D.N.Y.1986) (construing section 35(b), which provides mandatory fee awards and treble damages in cases of intentional counterfeiting, and identifying as extenuating circumstances the economic ruin of the infringer's family, thereby justifying departure from what would otherwise be a mandatory award.)